John F. "Jack" WALSH, et
al., Plaintiffs,

v.

FORD MOTOR COMPANY, Defendant.

Civ. A. No. 81–1998.

United States District Court,
District of Columbia.

March 26, 1990.

Norman B. Smith, Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N.C., Beverly C. Moore, Jr., Washington, D.C., William H. McDonald, David A. Childers, John E. Price, Robert M.N. Palmer, Woolsey, Fisher, Whitaker, McDonald & Ansley, Springfield, Mo., for plaintiffs.

William T. Coleman, Jr., Richard C. Warmer, Carl R. Schenker, Jr., John H. Beisner, Aaron S. Bayer, Barbara L. Strack, O'Melveny & Myers, Washington, D.C., Henry R. Nolte, Jr., James M. MacNee, III, John L. Wanamaker, Office of General Counsel, Ford Motor Co., Dearborn, Mich., for defendant.

OPINION

JUNE L. GREEN, District Judge.

Plaintiffs in this nationwide warranty action seek damages and equitable and declaratory relief against defendant for alleged defects in its motor vehicles. On behalf of a potential class of up to nine million parties, plaintiffs have moved for recertification or certification of four classes of Ford owners, pursuant to Rule 23, Fed.R.Civ.P., and the Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2310, *et seq.* (1982) ("Magnuson–Moss" or "the Act"). Upon consideration of the plaintiffs' motion and statement in support, defendant Ford Motor Company's ("Ford") opposition, plaintiffs' reply, supplemental filings by both parties, oral argument, the entire record, and for the reasons set forth below, the Court denies the motion as to all proposed classes.

### I. *Factual Background*

The legal odyssey this action has journeyed these past several years may be charted by reference to the Court's earlier decisions in the matter.[1] However, for present purposes a brief review of the background and progress of the action is needed.

The essence of plaintiffs' complaint is that all 1976 through 1979 and certain 1980 model year Ford vehicles fitted with C–3, C–4, C–6 and FMX automatic transmissions were designed and built defectively, resulting in both actual incidents of "park-to-reverse" movement and the continuing possibility of future incidents. For purposes of this litigation, a park-to-reverse phenomenon is understood to mean the sudden reverse movement of a vehicle after the operator attempted to locate the gear selector in the park position. *See* Exhibits to Plaintiffs' Motion for Recertification, Dkt. No. 496, entered March 18, 1988, Exhibit

---

1. *See, e.g., Walsh v. Ford Motor Co.,* 106 F.R.D. 378 (D.D.C.1985) (conditionally certifying three classes pursuant to Rule 23); *Walsh v. Ford Motor Co.,* 588 F.Supp. 1513 (D.D.C.1984) (defining jurisdictional requirements of Magnuson–Moss Warranty Act and denying defendant's motion to dismiss the second amended complaint); Memorandum Opinion, Dkt. No. 38, entered Dec. 23, 1982 (denying motion to dismiss the first amended complaint); Memorandum Opinion, Dkt. No. 20, entered Feb. 25, 1982 (denying defendant's motion to transfer to Eastern District of Michigan).

("P.Ex.") A at ¶¶ 5.0–8.0. This problem seems to arise when the engine is running and the transmission in fact remains *out* of gear after such a selection, leaving open the possibility of a subsequent spontaneous engagement of the reverse gear. *Id.*

Plaintiffs have presented evidence of more than 22,000 alleged Ford park-to-reverse incidents since 1970, Statement of Points and Authorities in Support of Plaintiffs' Motion, Dkt. No. 492, entered March 1, 1988, ("Plaintiffs' Statement") at 17, resulting in as many as 175 fatalities. P.Ex. G at 3. Similar reports date back as far as 1968, P.Ex. A, Attachment 2 at 1, and have been recorded in vehicles from every model year since 1970. *Id.* at ¶¶ 12.0–12.4 and cited attachments. Responding to complaints, the National Highway Traffic Safety Administration ("NHTSA") conducted an extensive investigation into the possible cause and remedy for this phenomenon. However, unable to isolate a specific defect, NHTSA agreed to curtail its investigation in 1980, after gaining Ford's agreement to advise all affected owners of the alleged problem and to remind them of proper operating procedures which should preclude the phenomenon. P.Ex. J at 1; Exhibits to Statement of Points and Authorities of Defendant Ford Motor Company in Opposition to Plaintiffs' Motion for Recertification, Dkt. No. 509, entered May 4, 1988, Exhibit ("D.Ex.") 8 at 2. That agency action in turn sparked litigation by the Center for Auto Safety ("CFAS"), seeking to invalidate the agency findings and force a recall of the affected vehicles. However, the Court of Appeals refused to review the NHTSA Administrator's decision to close the Ford investigation in this manner. *CFAS v. Dole*, 846 F.2d 1532 (D.C.Cir.1988), *vacated CFAS v. Dole*, 828 F.2d 799 (D.C.Cir.1987).

Meanwhile, scores of personal injury and wrongful death actions were filed throughout the country, based on park-to-reverse incidents like those alleged in this suit.[2]

## II. *Procedural Background*

The plaintiffs in this matter sought initially classwide recovery predicated on a number of legal theories, including breach of implied warranty of merchantable quality, breach of written warranty, negligence and strict tort liability. *See* Complaint, Dkt. No. 1, entered Aug. 25, 1981, at ¶¶ 35–39. Citing Magnuson–Moss and state law, the class representatives demanded compensatory and punitive damages for personal injury, property and other economic losses, and liability, as well as declaratory, injunctive and other equitable relief. *Id. See also* First Amended Complaint, Dkt. No. 26, entered Apr. 27, 1982; Second Amended Complaint, Dkt. No. 95, entered May 23, 1983.

Since plaintiffs filed their first complaint in 1981, the Court has sorted through the various legal theories and proposed classes, narrowing their scope considerably. *See, e.g., Walsh v. Ford Motor Co.*, 627 F.Supp. 1519 (D.D.C.1986) (holding that plaintiffs cannot seek punitive damages under Magnuson–Moss); Order, Dkt. No. 338, entered Dec. 26, 1985 (severing personal injury claims and transferring them to the United States District Court for the Western District of Missouri); *Walsh*, 106 F.R.D. 378 (denying certification of class seeking recall or retrofit of vehicles or issuance of extended written warranties covering potential park-to-reverse incidents; denying certification of personal injury class; certifying classes described below); *Walsh*, 588 F.Supp. 1513 (holding that lack of vertical privity between plaintiffs and defendant in states requiring presence of that relationship to advance a warranty claim defeats an action in those states). As a result, the classes remaining after this Court's last certification order were, essentially: (1) a class of owners who had experienced a park-to-reverse incident within the written warranty period *and* had reported the event to Ford within a reasonable time, claiming on the basis of breach of written warranty; (2) a class of owners, subject to

**2.** According to a spokesman for CFAS, damage claims filed separately from this action by 1985 totalled more than $1.6 billion. *Washington Times,* May 13, 1985.

The plaintiffs' principal witness, Simon Tamny, has testified in over 300 state and federal lawsuits since 1975 concerning Ford park-to-reverse incidents. P.Ex. A at ¶ 3.0.

privity limitations, who had experienced park-to-reverse incidents, claiming on the basis of breach of the implied warranty of merchantability; and (3) a class of all owners seeking recovery for difference in value, also claiming on the basis of breach of the implied warranty of merchantability. *See Walsh,* 106 F.R.D. at 414. The Court certified defendant's petition for appellate review of the interlocutory certification order, Order, Dkt. No. 296, entered Aug. 16, 1985, and the D.C. Circuit, in turn, granted hearing on the petition. Order, Dkt. No. 324, entered Nov. 7, 1985.

This Court had certified the three classes on the basis of an admittedly liberal construction of the interplay of the Act and Rule 23. *Walsh,* 106 F.R.D. at 387. Having reviewed the legislative history, design and practical implications of the Act, the Court was persuaded that this was the only means of providing the broad relief the Act clearly contemplates in the context of nationwide contract actions. *Id.* However, the D.C. Circuit disagreed, remanding the case for rehearing of the certification motion under the strict construction of both the Act and Rule 23's traditional class action requirements. *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1006–11, 1019 (D.C.Cir. 1986), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 677 (1987).

The Court of Appeals made several specific demands of this Court on remand. As to factual issues, the appellate court asked us to reconsider Ford's claim that twenty or more separate subclasses may be required to account for distinctions between Ford transmission configurations, 807 F.2d at 1017–18; an issue which this Court had reviewed but not determined in its previous opinion. 106 F.R.D. at 394–95. They also considered plaintiffs' primary physical proof of defect in assessing the commonality of fact determination. Noting that unsharp roostercomb teeth, the alleged main cause of failure to automatically self-center in all transmission groups at issue, is a feature common to many non-Ford transmissions as well, 807 F.2d at 1018, they called upon this Court to determine how "configuration-specific" the proof of design defect is likely to be. *Id.* In short, they

demanded "something else" besides the alleged roostercomb problem to show that these 25 groups can be treated in common for class purposes. *Id.*

With regard to common issues of law, the Court of Appeals confirmed this Court's assertion that state warranty law governs plaintiffs' claims under the Act. *Id.* at 1012. However, they rejected our suggestion that the Court might employ a choice of law analysis to derive a single state's law to apply. *Id.* Instead, they determined that individual state laws apply, and directed plaintiffs to "creditably demonstrate, through an 'extensive analysis' of state law variances, that class certification does not present insuperable obstacles." *Id.* at 1017 (citation omitted). While observing that this task is not, by definition, impossible to achieve, they did approve Ford's conclusion that this point of conflict " 'can only be resolved by first specifically identifying the applicable state law variations and then determining whether such variations can be effectively managed through creation of a small number of subclasses grouping the states that have similar legal doctrines.' " *Id.*

Finally, the D.C. Circuit's assessment of the interplay between Rule 23 and the Act requires that plaintiffs propose an appropriate plan for giving individual notice to all potential Rule 23(b)(3) plaintiffs. *See id.* at 1011. This Court had proposed a substitute method of achieving notice in this instance, since traditional notice requirements seemed inconsistent with the intent and design of the Act. *Walsh,* 106 F.R.D. at 411–12.

On remand, the Court has seen three efforts by plaintiffs to gain recertification of representative classes. The first attempt preceded the formal remand of the case from the Court of Appeals, Plaintiffs' Motion for Recertification, Dkt. No. 405, entered Apr. 7, 1987, and fell short of the Court's expectations for a post-remand effort, *see* Transcript ("Tr.") of Status Conference of Apr. 28, 1987, at 6, so the Court allowed a second briefing. The second offering also failed to address adequately many of the concerns shared by this Court

and the Court of Appeals. *See generally* Plaintiffs' Motion for Recertification, Dkt. No. 435, entered June 30, 1987. The shortcomings of plaintiffs' filings were glaring symptoms of discord and disorganization within plaintiffs' team of attorneys and experts. *See, e.g.,* Landon Gerald Dowdey's Motion for Determination of Responsibilities of Class Counsel, Dkt. No. 457, entered Oct. 30, 1987; Plaintiffs' Motion for Leave to Depose Simon Tamny (who had been formerly, and now is again, plaintiffs' *own* expert), Dkt. No. 465, entered Dec. 1, 1987.

Having feared for some time that the behavior and performance of plaintiffs' lead counsel imperiled the right of all potential class members to adequate legal representation, the Court convened the parties in chambers on December 16, 1987, for a closed hearing. *See* Sealed Transcript of Dec. 16, 1987, Proceedings, Dkt. No. 485, entered Jan. 28, 1988. As a result of this hearing, plaintiffs realigned their trial team, and the Court excused one of its original members. *See* Order, Dkt. No. 473, entered Dec. 17, 1987. The Court exercised its discretion to allow the plaintiffs' reconstituted trial team a third and final post-remand briefing opportunity. The resulting voluminous submissions from both parties are the focus of this opinion.

### III. *Legal Discussion*

#### A. *The Class Action Device*

The class action provisions of Rule 23 are designed principally to promote the efficient and economical conduct of litigation. *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 553, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974). However, classwide relief is an exception to the general rule that litigation be conducted by and on behalf of individual named parties only. *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982). It may be employed only when the Court determines that all of Rule 23(a)'s threshold requirements are satisfied.[3] These prerequisites are referred to commonly as numerosity, commonality, typicality and adequacy of representation. *General Telephone Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980).

Once the class representatives have satisfied all four Rule 23(a) requirements, they must establish further that at least one of Rule 23(b)'s provisions applies to their proposed class. Two of these three provisions are implicated in the present case.

■ Rule 23(b)(3) provides for certification of a class if the Court determines (1) that questions of fact or law common to the entire class predominate over questions affecting only individual members, *and* (2) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R. Civ.P. 23(b)(3); *Walsh,* 807 F.2d at 1002 n. 5. These requirements are known generally as predominance and superiority.

■ Rule 23(b)(2) authorizes class certification where plaintiffs seek injunctive or declaratory relief against a defendant whose specific conduct is at issue. However, this provision does *not* apply where "the appropriate final relief relates exclusively or predominately to money damages." *Walsh,* 807 F.2d at 1003 n. 7 (quoting Advisory Committee Note to Fed.R. Civ.P. 23(b)(2) (1966 Amendment)). The burden of proof as to this certification element, as with all Rule 23 requirements, rests on the party seeking class status. *Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir.1974), *cited in In re Asbestos School Litigation,* 104 F.R.D. 422, 427, *modified* 789 F.2d 996 (E.D.Pa.1984).

■ The district court should restrict its inquiry on a certification motion to a determination of "whether a class action is appropriate, not the probability of plaintiffs'

---

**3.** Fed.R.Civ.P. 23(a) reads:

Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

success on the merits of the substantive claim." *Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541, 543 (E.D.Pa. 1976) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). However, this determination generally involves considerations which are "enmeshed in the factual and legal issues comprising plaintiff's cause of action." *Falcon*, 457 U.S. at 160, 102 S.Ct. at 2372 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978). *See also* 15 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure* § 3911 n. 45 (1976) ("Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims.... The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits...."). As a result, the depth of the Court's inquiry will be a reflection of the complexity of issues presented.

Plaintiffs seeking Rule 23(b)(3) certification who meet all of the preceding requirements face a last major practical hurdle: Rule 23(c)(2) requires the representative plaintiffs to provide individual notice to all class members whose names and addresses may be ascertained through reasonable effort. Fed.R.Civ.P. 23(c)(2); *Walsh*, 807 F.2d at 1007 (citing *Eisen*, 417 U.S. at 173, 94 S.Ct. at 2150). As a result, the class proponents' resources may be the final determinant of class viability.

**B.** *The Proposed Classes*

Plaintiffs have presented to the Court the following four proposed classes, seeking certification of the first two and one of the last two:

I. *Implied Warranty Incidents*, pursuant to Rule 23(b)(3):

All purchasers or owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking recovery of property damages incurred as a result of a Ford park-to-reverse incident, but excluding

such persons who purchased such Ford vehicles in States which require the presence of vertical privity to pursue such claims.

II. *Written Warranty Incidents*, pursuant to Rule 23(b)(3):

All purchasers or owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking recovery of property damages incurred as a result of a Ford park-to-reverse incident occurring within the 12,000 mile/12 month written warranty period about which they complained to Ford or a Ford dealer within a reasonable time thereafter.

III. *All Current Owners Implied Warranty Recall and Retrofit*, pursuant to Rule 23(b)(2):

All current owners (other than for purposes of resale) of 1976–1979 and 1980 pre-design change model year Ford vehicles equipped with an FMX, C–3, C–4, or C–6 automatic transmission seeking the equitable relief of recall and retrofit, but excluding such persons who purchased such Ford vehicles in States which require the presence of vertical privity to pursue such claims.

IV. *All Current Owners of Light Trucks and Vans Equipped With C–6 Transmissions Implied Warranty Difference in Value Damages*, pursuant to Rule 23(b)(3):

Alternatively to Class III, all current owners of 1976–1979 and 1980 pre-design change model year Ford light trucks and vans equipped with C–6 transmissions seeking recovery of damages equal to the difference in value between those transmissions as received and those transmissions as impliedly warranted, but excluding such persons who purchased such Ford vehicles in States which require vertical privity to pursue such claims.

Plaintiffs' Motion for Recertification, Dkt. No. 492, entered Mar. 1, 1988, ("Plaintiffs' Motion") at 1–2. While each of these

classes must pass muster individually under Rule 23, the Court will consider jointly the many shared issues among the classes, However, the Court shall consider the All Owners for Recall and Retrofit class first as it is the only class which the plaintiffs propose to certify under Rule 23(b)(2) and therefore, presents several unique issues.

### 1. The "All Owners" for Recall and Retrofit Class

█ In its prior opinion this Court refused to certify a class of all owners seeking recall and retrofit or other equitable remedies because it viewed money damages as the more appropriate form of relief for the alleged classes. *Walsh,* 106 F.R.D. 391–92. The Court remains convinced that monetary damages are more suitable in this litigation, particularly in view of the practical limitations which the proposed equitable relief presents.

Courts prefer money damages to equitable remedies whenever such awards provide adequate relief. *Goadby v. Philadelphia Elec. Co.,* 639 F.2d 117, 122 (3d Cir.1981) ("the basic tenet of equity jurisprudence [is that] if an adequate remedy at law exists, equitable relief will not be granted") (citing *O'Shea v. Littleton,* 414 U.S. 488, 499, 94 S.Ct. 669, 677, 38 L.Ed.2d 674 (1974)); *Walsh,* 106 F.R.D. at 392 (citing *Restatement (Second) of Contracts* § 359(1) (1981)). Consistent with this policy, Rule 23(b)(2) was not intended to "extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed.R.Civ.P. Advisory Committee Note to Rule 23, *quoted in Walsh,* 106 F.R.D. at 392.

This general rule ought to be respected particularly when the equitable relief sought demands more resources and supervision than the Court can muster reasonably, and thus threatens to create an award which is either incapable of full and effective enforcement or uncertain to provide full relief. *Cf. In re Asbestos School Litigation,* 104 F.R.D. 422, 438–39 (E.D.Pa. 1984) (despite plaintiffs' efforts to frame a damage claim as an equitable demand for removal of asbestos, the case remained essentially a demand for legal damages), *aff'd in relevant part,* 789 F.2d 996, 1008 (3d Cir.1986). Plaintiffs do not dispute that the Court is powerless to order injunctive relief against Ford in states where vertical privity requirements defeat plaintiffs' claims, thus thwarting in large part the public policy objective of nationwide equitable relief in this case.[4] Nor do they deny that experience shows that only about one-half of all eligible car owners are likely to pursue an available recall and retrofit. *See* Ford's Opposition at 146 n. 147; Plaintiffs' Reply at 43 n. 27.[5] Yet, they expect the Court to ignore the conclusions drawn by the Secretary of Transportation and the NHTSA, *see* D.Ex. 8 at 2; *see also Walsh,* 807 F.2d at 1019 n. 111 (noting NHTSA's decision to deny any injunctive relief against Ford), and to order this recall to the extent it is legally possible.

By resorting only to the legal remedy of money damages, the Court would be more

---

**4.** While there is certainly a salutary effect to removing potentially hazardous vehicles from the roads, the fact that privity rules alone bar effective enforcement by this Court in at *least* fifteen states (the undisputed minimum which bars actions for want of privity as to either all vehicles or used vehicles, Plaintiffs' Statement at 138) ensures that the Court's effort would fall far short of plaintiffs' purported desire "to protect the tens of thousands of people ... who will be killed or maimed by Ford's defective vehicles as the years go by." Plaintiffs' Reply Memorandum, Dkt. No. 524, entered June 4, 1988, ("Plaintiffs' Reply") at 35.

**5.** The authority Ford cites for its 50 percent recall effectiveness assertion, the Government Accounting Office ("GAO"), also reported that lengthy investigatory delays further hamper owner response. In cases where investigations delayed the recall order for five and one-half to seven years, response rates ranged from only 8 to 20.5 percent of all owners. GAO, Pub. No. CED–82–99, *Report to the Secretary of Transportation: Changes to the Motor Vehicle Recall Program Could Reduce Potential Safety Hazards* at 6 (1982). For vehicles involved in the present litigation the delay caused by the NHTSA's lengthy investigation and the convoluted progress of this matter has been from eight to thirteen years.

That same GAO report also noted that in the Ford Pinto recall case, one of the most notorious and well-publicized in automotive history, the rate of owner response was merely 52 percent. *Id.* at 44.

certain to provide real benefits to affected motorists, who in turn could decide whether they are best made whole by receiving compensation for the loss of value caused by the alleged breach (measured by the cost of retrofit), or by applying the compensation to a retrofit they commission directly. *Compare Bregman v. Volkswagen of American, Inc.*, N.Y.L.J., June 3, 1980, at 6 (N.Y.Sup.Ct.1980) (endorsing a similar remedy). The Court also would avoid entanglement with a regulatory scheme designed and intended to empower principally the Department of Transportation, rather than the courts, to order and oversee motor vehicle recalls.[6] *See* National Traffic and Motor Vehicle Safety Act of 1966, as amended, 15 U.S.C. §§ 1381 *et seq.* (1982).

For all of these reasons, the Court denies certification to the proposed Rule 23(b)(2) class of all owners seeking recall and retrofit.

**2. Rule 23(b)(3) Classes**

The Court would be willing to treat the proposed Rule 23(b)(2) class as a potential Rule 23(b)(3) class of all owners seeking monetary compensation for the cost of repairing the alleged defect in their vehicles. However, such treatment would get the potential plaintiffs no further than they stood without it. Once the proposed all owners class is reconstituted as a potential Rule 23(b)(3) class, it ceases to be viable out of fundamental, practical necessity: the plaintiffs cannot afford to pursue it. As they have admitted in their pleadings, the cost of serving notice on all potential class members in accordance with Rule

23(c)(2) far exceeds plaintiffs' resources. Plaintiffs' Statement at 137, 140–42.

The plaintiffs have anticipated this outcome. They have proposed an alternative class of light truck and van owners seeking "difference in value damages." *See* Plaintiffs' Statement at 2. *See also* Plaintiffs' Reply at 26 (seeking recertification of the previously-approved Rule 23(b)(3) all owners class). It is presumed that such a class would be sufficiently small that the plaintiffs could afford to provide the requisite individual notice to class members. Therefore, the Court will proceed with a full analysis of Rule 23's requirements to determine whether this class or either of the proposed incidents classes merit certification.

**C. Rule 23(a) Requirements**

**1. Numerosity**

The first requirement set forth by Rule 23(a) is that the proposed "class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a). This is the lone Rule 23 issue not disputed by the parties. As stated above, the potential class (as a whole) projects into the millions, and even the formation of numerous subclasses would not be likely to reduce any one unit to a number where joinder would be feasible. Thus, at the outset,[7] plaintiffs appear capable of satisfying this criterion with ease.[8]

**2. Commonality**

Rule 23(a)'s second element requires the Court to find questions of law *or* fact com-

---

**6.** The Court does *not* suggest that Rule 23 and Magnuson–Moss do not allow the courts to order appropriate equitable relief when merited. However, a proper, discrete case for such action is not before the Court.

**7.** After applying state privity of contract restrictions to affected class members, the whole class and its subparts would be diminished greatly. *See infra* pp. 271–72 (state privity law discussion). It is most doubtful, however, that these numbers would be reduced enough to make joinder of all members practicable. *Compare* Fed.R.Civ.P. 23(a)(1); *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 261–62 (S.D.Cal.1988).

**8.** A further numerosity requirement arising under Magnuson–Moss has been pleaded by the plaintiffs and is not contested by Ford at this juncture. Section 2310 of the Act requires the action to feature 100 named plaintiffs in order to proceed as a federal class action. 15 U.S.C. § 2310(d)(3)(C). Considering the Court's prior ruling that plaintiffs from all proposed classes in the action may be pooled to meet this mandate, *Walsh*, 588 F.Supp. at 1537–38, this requirement should pose no obstacle at this time. That result might be different, however, after elimination of legally barred named plaintiffs (*e.g.,* those barred by privity restrictions).

mon to the class prior to certification. Fed. R.Civ.P. 23(a). The Court will outline both of these matters here, but it will also revisit the issue of commonality in discussing its predominance conclusions.

In this Court's prior certification decision, it held that common issues of law or fact were plainly present. 106 F.R.D. at 389. The Court now reaffirms that finding. This case presents more than one common issues of law or fact. Underlying every claim of each class member are the questions of (1) whether certain Ford transmissions during the model years in question suffered from design defects, (2) whether the alleged defects breached any written or implied warranties of merchantability, and (3) whether the alleged defects were present at the time the vehicles were manufactured. In addition, the question of whether Ford had knowledge of the alleged defects may play a role in the determination of liability for certain classes.

Other courts have remarked that the "threshold of commonality is not high." *Jenkins v. Raymark Indus. Inc.*, 782 F.2d 468, 472 (5th Cir.1986); *See also In Re School Asbestos Litigation*, 789 F.2d 996 (3rd Cir.1986), *quoting Jenkins*, 782 F.2d at 472. It may be met where, as here, the claims of every class member are based on a common legal theory, even though the factual circumstances differ for each member. *Joseph v. General Motors Corp.*, 109 F.R.D. 635, 640 (D.Colo.1986), *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir.1982) ("[f]actual differences in the claims of the class members should not result in a denial of class certification [on the grounds that Rule 23(a)'s commonality requirement has not been met] where common questions of law exist."), *cert. denied* 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983). However, the Court notes that a host of non-common issues surround these common legal theories of liability. The plaintiffs still must show that these non-common issues do not predominate in this litigation. The Court, therefore, will return to the question of common and non-common issues in considering the predominance requirement.

### 3. Typicality

Courts have noted that the requirements of typicality and commonality merge. *See e.g., Rodriguez by Rodriguez v. Berrybrook Farm, Inc.*, 672 F.Supp. 1009 (W.D. Mich.1987). "So long as there is a nexus between the class representatives' claims or defenses and the common questions of fact or law, which unite the class, the typicality requirement is satisfied." *Joseph v. General Motors Corp.*, 109 F.R.D. 635, 640 (D.Colo.1986). In this case the plaintiffs have a large pool of possible representatives to choose from. *See Walsh*, 106 F.R.D. at 890. The Court is satisfied that the plaintiff will be able to provide class representatives that adequately represent the interests of any class or subclass the Court would devise if this litigation were to continue. Nor is it fatal that such individuals have not yet been identified by the plaintiffs. *Id.*

### 4. Adequacy of Representation

In its prior determination of this issue, this Court declared that "[d]espite earlier misgivings, plaintiff's counsel has, to date, effectively managed and advocated what can only be described as an extremely complex class action." The Court was concerned sufficiently over the performance of plaintiffs' lead counsel to request a reorganization of its trial team.[9] The Court is confident that the plaintiffs' reorganized trial team would adequately represent the class members' interest if this litigation were to proceed. Therefore, the Court finds no reason to disturb its prior holding.

### D. *Rule 23(b)(3) Requirements*

As the Court previously indicated, it is not sufficient for the plaintiffs' proposed classes to satisfy merely Rule 23(a)'s four requirements. Each class also must overcome the hurdles which Rule 23(b) places on the path to certification. Accordingly, the Court shall consider whether either the proposed written or implied warranty incidents classes or the remaining truck and

---

**9.** *See supra*, p. 264.

van owners class survive Rule 23(b)'s certification requirements. Much of the Court's analysis shall apply to each of the three proposed classes. However, individual concerns raised by the written warranty incidents and all truck and van owners classes shall be addressed separately.

### 1. Predominance

In remanding the case for further review, the Court of Appeals instructed this Court to make a "considered predomination determination". *Walsh*, 807 F.2d at 1017. The Court of Appeals further determined that this Court's earlier analysis of the predominance question was deficient in at least three significant respects. First, the Court determined that this Court had erred in considering only federal law applicable to the written warranty claims. Second, the Court ordered this Court to reexamine the question of predominance in light of its determination that varying state laws govern the existence and scope of any implied warranties. Third, the Court ordered this Court to revisit the issue of class-wide proof with the admonition that over twenty transmission configurations rather than merely four transmissions may be involved. The Court will address each of these matters in detail as they provide the underpinnings for its predominance conclusions. The Court will review its predominance findings in relation to the all owners class. It will then consider how the Court of Appeals' decision specifically affects its prior predominance findings for the incidents classes.

#### a) *Common Issues of Fact*

In order to show that issues of fact are common to the proposed class litigation under Rule 23, the plaintiffs must show that the substance of the evidence is substantially the same for all class members. *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413–14, n. 8 (D.C.Cir.1984); *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 321–22 (5th Cir.1978); *Ambercrombie v. Lums, Inc.*, 345 F.Supp. 387, 390 (S.D.Fla.1972). While the plaintiffs are not required to

prove their case to obtain class certification, *Walsh*, 807 F.2d at 1017–18, *citing Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974), they must present credible classwide proof that the Ford vehicles in question suffered from some common defect causing the park-to-reverse phenomenon.

The plaintiffs' first attempt to show a common defect was rejected by the Court of Appeals as inadequate because it hinged on proof of an unsharp roostercomb, a mechanical condition which was common to most automobiles sold at the time.

The plaintiffs' burden on remand was to identify reasonably a body of evidence which is common to all of the different Ford vehicles at issue and which distinguishes the special characteristics causing park-to-reverse incidents in Ford vehicles from comparable non-Ford vehicles. After several attempts, the plaintiffs still have failed to meet that burden.

In their latest submissions, the plaintiffs argue that Ford transmissions possess three characteristics which, in combination, cause park-to-reverse incidents: (1) lack of self-centering; (2) shift roughness; and (3) shift force (or effort). The plaintiffs continue to identify a lack of self-centering due to an improper roostercomb configuration as a fundamental consideration in their theory. *See* P.Ex. A (Affidavit of Simon Tamny) at ¶ 15.3. However, they claim that the combination and interaction of excessive shift roughness and shift force with improper centering distinguishes Fords from non-Fords.

While the Court does not judge the sufficiency of the plaintiffs' evidence, it does seem tenuous to determine that the shift characteristics (shift roughness and shift force) of Ford vehicles are inferior to non-Ford vehicles based on the data presented by the plaintiffs. The mechanical studies which the plaintiffs claim show excessive shift roughness and shift force in Fords involve very small numbers of vehicles.[10]

---

**10.** The shift traces which the plaintiffs claim show excessive shift roughness test only four

Ford vehicles and compare them to only two

Furthermore, as Ford points out, the comparison data used by the plaintiffs appears to illustrate substantial similarities between Ford and non-Ford vehicles. For example, the shift traces for a 1978 General Motors THM 350 and a Chrysler Cordoba appear to display similar characteristics—a second force peak and continued resistance—to those identified by the plaintiffs as significant in Ford vehicles. *See* Plaintiffs' Statement, at 49–55; P.Ex. A at ¶ 15.7; Defendants' Opposition, at 69–72. And the plaintiffs' data also reveals an overlap between Ford and non-Ford vehicles in the ranges of force required to shift from reverse into park. *See* Defendant's Opposition at 68. Moreover, the plaintiffs' expert witness, Mr. Tamny, has testified on three previous occasions that Ford's rates of shift force, with the exception of the C–6 transmission, are comparable to Chrysler's. *See,* Defendant's Opposition, at 69.

Even accepting the plaintiffs' assertion that the data reveals higher levels of shift roughness and shift force for Fords versus non-Ford vehicles, the plaintiffs have not shown that these levels are statistically significant in producing higher rates of park-to-reverse incidents in Ford automobiles. Thus, the plaintiffs' evidence of the shift characteristics of Ford vehicles does not appear to fit the bill of classwide evidence of a common defect.

The plaintiffs' evidence suffers from a final more fatal flaw. The evidence which the plaintiffs seek to present on both shift roughness and shift force is not uniform as to the Ford models in question. The plaintiffs acknowledge that the shift characteristics for C–6 transmissions differ substantially from the C–3, C–4 and FMX transmissions. But these differences skim only the surface of the problem. Shift characteristics are highly variable factors determined by the interaction of numerous different components. Both the plaintiffs and the defendants have suggested that factors such as varying linkage connections, gearshift configurations, wear and tear on the vehicle and human error may play a role in determining shift force and roughness levels. That some of these factors may offset others in particular automobiles does not overcome the necessity of producing evidence on all these factors at trial to explain how park-to-reverse could occur in the Ford models relevant to the proposed class action.

The Court cannot accept the plaintiffs' assertion that differences in design among Ford's systems are minor and immaterial. Even after examining the plaintiffs' statistical data of incident rates, the Court finds an unexplained disparity between the assorted transmission systems.[11]

Therefore, the Court concludes that the plaintiffs have not met their burden of showing that factual issues common to the proposed classes of vehicles predominate.[12]

non-Ford vehicles. *See* Plaintiffs' Statement, at 50–54.

The series of three studies which the plaintiffs present to show Fords' excessive shift effort test only a total of sixteen Ford vehicles. (The first test series involved only one Ford, one Chrysler and one GM vehicle. The second series tested only one Ford model, the Lincoln Continental, against assorted models of other makers.) D.Ex. 2 (Affidavit of Robert C. Lange) at 85–86. Over half of the sixteen Ford vehicles were equipped with the same control system using a C–6 transmission. Plaintiffs' experts have stated that the C–6 transmission evidences higher shift efforts than any other Ford transmission. P.Ex. B (Affidavit of Dr. Richardson) at 6; *See also,* D.Ex. 2 (Affidavit of Robert C. Lange) at 78–79.

**11.** The Court is perplexed by the plaintiffs' response that apparent disparities among the incident rates of Ford vehicles broken down into transmission system groupings can be explained by random variability. Plaintiffs' Reply, at 24–25. Such large deviations suggest to the Court that either the sample population is inadequate or that the disparities are statistically significant. In any case, the plaintiffs' attempt to explain away these statistical differences does not meet their burden to show that the evidence is in fact common to all relevant Ford vehicles.

**12.** Although the Court recognizes that the factual issues implicated by the plaintiffs' proposed subclass of Ford trucks and vans will be less disparate than factual variations in other proposed classes, the Court remains unconvinced that common factual issues predominate even in this class. While all the vehicles in the proposed trucks and vans subclass contain C–6 transmissions, the linkage systems vary greatly among the different models. *See* Defendant's Opposition at 60. The plaintiffs, themselves, have noted specific mechanical effects caused

The Court turns now to consider whether common issues of law are so prevalent that the class action should proceed despite factual disparities among class members.

### b) *Common Issues of Law*

█ In its prior opinion, this Court held that state law variations were not so overwhelming as to bar class certification. It did so in the belief that Magnuson–Moss provided a mechanism to simplify the choice of law problems a federal court inevitably faces in determining a state-based implied warranty claim under a federal cause of action involving multiple jurisdictions. Although this Court was not prepared at that time to address the question of what law would apply to these claims, it was persuaded that the drafters of Magnuson–Moss could not have intended to saddle a court with the gargantuan task of sifting through the various state law interpretations of a breach of an implied warranty claim. However, the Court of Appeals determined that this is precisely what the Magnuson–Moss Act mandates. *Walsh*, 807 F.2d 1014–17. And the Court ordered the plaintiffs to demonstrate, through an extensive analysis, that state law variations would not be an insurmountable obstacle on the path towards class certification. *Id.* at 1017

This Court finds that the plaintiffs have been unable to clear this hurdle. Contrary to the plaintiffs' contention that no state law variations, except a limited number of state privity requirements, are applicable to this case, the Court finds numerous variations exist among states' laws concerning the scope and application of implied warranty claims. It finds that state law also varies on related issues such as vertical privity requirements, contractual limitations of implied warranties, limitations on plaintiffs' remedies and affirmative defenses available to the defendant.

Before the question of the similarities between states' implied warranty laws can be addressed, this Court must once again consider the impact of varying state vertical privity requirements. As this Court has previously held, the genesis of a Magnuson–Moss implied warranty action is state law. *Walsh*, 588 F.Supp. 1513, 1525. *See also Walsh*, 807 F.2d at 1013. If a state bars an implied warranty cause of action because vertical privity is lacking, the claim is barred under the Act. This Court, therefore, is obligated to assess the relevant privity rules on a state-by-state basis.

The exhaustive coverage which both the plaintiffs and defendant give the issue of privity in their current submissions to the Court, reflects its complexity. *See* Ford's Opposition at 10–16, Tab 1 at 1–63; Plaintiffs' Statement at 60–82; Plaintiffs' Reply at 45–49. The plaintiffs and the defendant are in agreement on the vertical privity laws of twenty-three states.[13] In the remaining twenty-seven states, the defendant contends, and the plaintiffs dispute that vertical privity rules at least partially bar an implied warranty cause of action. In three states, Illinois, Kentucky and Michigan, Ford contends, and the plaintiffs dispute, that the privity requirements bar all purchasers from maintaining an implied warranty claim. Ford's Opposition at 14 & Tab 1 at 7–18; Plaintiffs' Statement at

---

by certain linkage types which are not produced by other linkages. *See* Plaintiffs' Statement at 29; Defendant's Opposition at 60.

**13.** The parties appear to agree that no purchasers are barred by a lack of privity from recovering damages for breach of an implied warranty in the following jurisdictions: Arkansas, Maine, Massachusetts, Mississippi (for purchases after 4–27–76), New Hampshire, South Carolina and Virginia. The parties also agree that all purchasers are barred by a lack of vertical privity in the following jurisdictions: Alabama, Arizona, Connecticut, Florida, Idaho, Indiana, Mississippi (for purchases before 4–27–76), New

York, Ohio, Washington and Wisconsin. Finally, the parties are in agreement that all purchasers of used vehicles are barred by a lack of privity in the following jurisdictions: California, Georgia, Illinois (the defendant contends that *all* Illinois purchasers are barred), North Carolina, and Oregon. *See* Ford Recert.Opp. (dated April 29, 1988), pp 11–16 & Tab 1; Pl.Mem. (dated Feb. 29, 1988) pp. 60–83. The plaintiffs have also agreed to exclude any potential plaintiffs from Texas on non-privity grounds and from American Samoa, the Canal Zone, Guam, Puerto Rico, and the Virgin Islands as they have failed to locate any applicable case law in these jurisdictions.

66–72. While the plaintiffs have averred that a lack of privity generally does not bar recovery by purchasers of used goods against the manufacturer, Ford argues that position is contradicted by treatises. Ford's Opposition at 14, Tab 1 at 41–42; *See* B. Clark & C. Smith, *The Law of Product Warranties*, ¶ 10.02(2), at 10–16 (1984); 3 J. McDonnell & E. Coleman, *Commercial and Consumer Warranties*, ¶ 24.04(1), at 24–25, n. 6 (1987). In particular Ford contends, and plaintiffs dispute, that a lack of privity bars recovery by all used vehicle purchasers in Pennsylvania, and in Kentucky, Kansas and Maryland for purchases from a prior non-merchant owner. *See* Ford's Opposition, Tab 1 at 43–48; Plaintiffs' Statement at 73–74; Plaintiffs' Reply at 46–48. Pointing out that Pennsylvania and Kentucky are jurisdictions that have adopted Alternative A of U.C.C. Section 2–318, while Kansas and Maryland have adopted Alternative B of U.C.C. Section 2–318[14], Ford suggests that other Alternative A and Alternative B jurisdictions also would find that a lack of privity bars the implied warranty claims of used vehicle purchasers.[15]

In addition to these disputes, the parties disagree as to whether claims for economic loss would be allowed in Tennessee or Iowa, and whether purchasers for business use in Oregon and California would be subject to privity requirements. For Hawaii, Utah, Vermont, New Mexico and Rhode Island, Ford contends that the plaintiffs have failed to present relevant case law on privity requirements. Finally, the parties

dispute which states allow a purchaser without privity to sue for indirect economic losses.

The Court makes no determination on the merits of any of the parties' above-recited contentions. It simply records them to illustrate the numerous and diverse dilemmas this Court would face if it were to certify the plaintiffs' case. These dilemmas have multiplied since the inception of this case. Both the plaintiffs and defendant ask this Court to consider many novel questions concerning state privity laws. In addition, the Court has found it necessary to amend its prior privity rulings on two occasions, *Walsh*, 612 F.Supp. 983 (D.D.C. 1985) (motion to expand certified classes to include purchasers from New Jersey granted); *Walsh*, 1987 WL 17667 (D.D.C.1987) (implied warranty claim of named Florida plaintiff dismissed because Court now determines privity required in Florida), and both the plaintiffs and defendant promise to challenge future privity rulings. While the Court does not agree with the defendant that state variations in vertical privity requirements are an insuperable obstacle to class certification, they do present a troublesome stumbling block. Along with the various implied warranty standards and other subsidiary issues giving rise to varying standards of law, the numerous vertical privity rules convince this Court that a predominance of common issues are not present in this case.

The plaintiffs and the defendant agree that virtually all relevant jurisdictions[16]

---

**14.** Alternative A of U.C.C. Section 2–318 reads as follows:

A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest of his house if it is reasonable to expect that such a person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

Alternative B of U.C.C. Section 2–318 reads: A seller's warranty whether express or implied extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the

warranty. A seller may not exclude or limit the operation of this section.

**15.** The following jurisdictions have adopted Alternative A of U.C.C. Section 2–318: Alaska, the District of Columbia, Kentucky, Michigan, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, Oklahoma, Pennsylvania, Tennessee and West Virginia. Vermont has adopted Alternative B of U.C.C. section 2–318.

**16.** Plaintiffs and the defendant are in agreement on the relevant statutes of every state except Louisiana and Wisconsin. The defendant maintains that Louisiana law is a unique exception to the general sales provisions of the UCC, as well as the particular UCC section 2–314(2)(c), which would require separate jury instructions. Both

have enacted a statutory version of UCC Section 2–314(2)(c), adopting a "fit for ordinary purposes" standard for claims based on implied warranties. Despite this fact, the defendant argues that state laws concerning implied warranties of merchantability are not uniform because state courts have ranged far and wide in "interpret(ing) and implement(ing) this vague standard." The plaintiffs, in contrast, claim that state implied warranty law is uniform except for mere semantical differences in judicial opinions interpreting the fit for ordinary purposes standard.

While neither party's analysis is completely accurate, the Court finds that the plaintiffs have not met their burden of illustrating, through extensive analysis, that the relevant states apply common standards of law which can be employed in trying this case. The state-wide adoption of the fit for ordinary purposes standard signals the growing uniformity among states' treatment of implied warranty claims. However, the Court's analysis cannot stop here. "(I)n most cases, to say that goods are fit for ordinary purposes does little to advance the analysis; it simply substitutes one synonym for another". J. White & R. Summers, *Uniform Commercial Code* at 473 (3d Ed.1988). The Court must examine how courts interpret and apply the standard and what defenses will overcome it.

The plaintiffs have catalogued a body of relevant case law which illustrates at least two varying interpretations of the fit for ordinary purposes standard. Plaintiff's Statement at 94–105, nn. 33–40. The plaintiffs themselves distinguish between states which employ a "functional approach" (does the product work?) in defining merchantability from those which follow a "quality level" approach (where on a line between perfection and worthlessness does

the product fall?). Plaintiffs' Statement at 94–96, nn. 33, 35; *See* Ford's Opposition at 20. These differences cannot be reduced to mere semantics as the plaintiffs suggest. They reflect divergent judicial philosophies on the scope and content of the breach of implied warranty standard, which may significantly effect the wording of jury instructions, the standard for a directed verdict and ultimately, the outcome of the case.

To deny certification on these grounds alone would thwart future multistate class actions involving implied warranty claims. Were the Court not faced with numerous other non-common issues of law and fact, it would be willing to proceed by subclassing states according to their approach to breach of implied warranty claims. However, the Court is confronted with additional non-common issues of law. For example, in some states prolonged use of a product raises a presumption of merchantability. *Ford Motor v. Fairley*, 398 So.2d 216, 219 (Miss.1981); *Falcon Equip. Corp. v. Courtesy Lincoln Mercury. Inc.*, 536 F.2d 806, 810 (8th Cir.1976) (Iowa); *Cooper v. Mason*, 188 S.E.2d 653, 655 (N.C.Ct.App. 1972); Colo.Rev.Stat. § 13–21–403(3) (1987). Numerous vehicles included in the plaintiffs' proposed classes either experienced park-to-reverse incidents only after many years of use, or have yet to experience such incidents. Therefore, the Court would need to inquire whether the presumption of merchantability had been established as to each individual owner in those states providing for it, and also, whether the plaintiffs' evidence rebutted the presumption.

A further example is the effect of Ford's written warranty on state-based claims of breach of implied warranty. Ford's written warranty expressly limits any implied warranties to the same duration as its writ-

plaintiffs and the defendant refer the Court to La.Civ.Code Ann. art. 2520 (1986) which contains the following language:

Redhibition, definition

Redhibition is the avoidance of a sale on account of some vice of defect in the thing sold, which renders it wither absolutely useless of its use so inconvenient and imperfect, that it must be supposed that the buyer would

not have purchased it had he known of the vice.

As for Wisconsin, the defendant points out that the plaintiffs have failed to find any relevant law. However, Wisconsin is one of the states which bars the claims of potential plaintiffs on privity grounds, therefore, state law variations on other issues are irrelevant.

ten warranty (12 months/12,000 miles) and excludes recovery of any consequential damages for either written or implied warranties. Magnuson–Moss allows the manufacturer to restrict implied warranties to the same durational term as its written warranty as long as such term is conscionable. 15 U.S.C. § 2308(b). Some states, however, do not allow contractual restrictions on implied warranties while others limit such restrictions.[17] In addition, some states prohibit or restrict contractual limitations on remedies for breach of implied warranties.[18] Therefore, the Court would have to consider individual claims of each plaintiff from any of these states to determine if Ford's contractual restrictions apply.

The plaintiffs' contend that they are not availing themselves of the increased protection offered by some states against limitations on implied warranties or disclaimers against consequential damage. However, the plaintiffs cited such statutes in their formal submissions indicating their intent to use them. Plaintiffs' Second Amended Complaint (dated May 2, 1983) at ¶ 14(b); Plaintiffs' Initial Statement, at ¶ 87. Moreover, the Court questions whether a potential class member would be adequately represented by a class which refused to pursue his claim to the fullest extent possible.

The plaintiffs further contend that any state limitations on consequential damages are moot because they are not claiming any consequential damages, only direct damages. However, the plaintiffs seek relief for damage to other property as a result of park-to-reverse incidents, liability to others for property damage, towing charges and charges for rental vehicles which are all consequential damage claims. U.C.C. Section 2–715(2). *See* J. White & R. Summers, *Uniform Commercial Code* Section 10–4, at 386–87 (2d ed. 1980).

Finally, numerous state law variations concerning the types of affirmative defenses and damages available in breach of an implied warranty claims are implicated by the plaintiffs' claims. In some states contributory negligence is a defense to a breach of implied warranty claim.[19] Other states do not recognize contributory negligence but allow the defenses of assumption of the risk or product misuse against plaintiffs claiming breach of an implied warranty.[20] States which allow the defense, often vary in defining what constitutes product misuse.[21]

17. See e.g., D.C.Code Ann. §§ 28:2–316.1, 28:9–109(1) (1981 & Supp.1987) (prohibiting durational limits of implied warranties for sales of consumer goods); W.Va.Code Ann, § 46A–6–107 (Supp.1989); Kan.Stat.Ann. 50–639 (1988); Cal. Civ.Code §§ 1790–1793 (Supp.1989) (implied warranties for sale of consumer goods limited to minimum of 60 days and maximum of one year).

18. Some states prohibit limitations on remedies completely. See e.g., Miss.Code Ann. §§ 11–7–18, 75–2–719(4) (1981 & Supp.1987); Kan.Stat. Ann. 50–639(2) (1988); W.Va.Code Ann. 46A–6–107 (1976 & Supp.1989).

Other states prohibit limitations on remedies for breach of implied warranty involving only consumer goods. See e.g. Me.Rev.Stat.Ann., tit. 11, § 2–316(5) (Supp.1987); Mass.Gen.Laws Ann. ch. 106, § 2–316A (West 1990); Vt.Stat. Ann. tit. 9A, § 2–316(5) (Supp.1987); Md.Ann. Code, Commercial Law, § 2–316.1 (1975 & Supp.1989) (this section does not apply to the sale of certains automobiles); Ct.Stat. tit. 42a, § 2–316 (Supp.1989) (limitation prohibited as to sales of *new* or *unused* consumer goods).

19. See e.g., Stephan v. Sears, Roebuck & Co., 110 N.H. 248, 251, 266 A.2d 855, 858 (N.H.1970);

Hagenbuch v. Snap-on Tools Corp., 339 F.Supp. 676, 686 (D.N.H.1972); N.C.Gen.Stat. § 99B–4.

20. Gregory v. White Truck & Equip. Co., Inc., 163 Ind.App. 240, 323 N.E.2d 280 (Ind.App. 1975). See, also, Hensley v. Sherman Car Wash Equip. Co., 33 Colo.App. 279, 282, 520 P.2d 146, 148 (Colo.Ct.App.1974) ("The concept of contributory negligence, as it is known in negligence case law ... has no place in actions premised on breach of warranty"); Holt v. Stihl, Inc., 449 F.Supp. 693, 695 (E.D.Tenn.1977).

21. Compare, Payne v. Soft Sheen Prods., Inc., 486 A.2d 712, 725–26 (D.C.1985) ("product 'misuse' is defined as use of a product in a manner that could not reasonably be foreseen by the defendant") with Hallmark Color Labs, Inc. v. Damon Corp., 20 Mass.App.Ct. 909, 477 N.E.2d 1052 (Mass.App.1985) (Under the doctrine of product misuse, a breach of implied warranty claim may be nullified where the user put a product to a use other than its intended one) and N.C.Gen.Stat. § 99B–4(1) (1985) (no product liability if "[t]he use of the product giving rise to the product liability action was contrary to any express and adequate instructions or warnings delivered with, appearing on, or at-

Furthermore, some states employ "pure" comparative negligence [22] or some other form of comparative negligence [23] principles in assessing liability for breach of an implied warranty action. And states also use varying means to calculate difference-in-value damages under U.C.C. Section 2–714(2).[24]

#### c) *Bifurcation will not Solve Problem of Proposed Class Litigation*

■ Plaintiffs claim that one of the devices available to the Court which will resolve the problem of numerous individual factual and legal issues is bifurcation. They propose a joint, two-phase trial for both implied warranty and written warranty incidents classes: first, a liability phase to establish the existence of a defect, then a damages phase, to examine individual damage claims. Plaintiffs' Statement at 126–27.

The difficulty of bifurcation becomes apparent, however, when one considers the complex weave of issues at both stages of such a trial. In this case, the liability phase will focus on plaintiffs' purported

statistical and mechanical proofs of defect. Central to the weight of this evidence is the mere volume of alleged incidents and the supporting interpretations of that evidence by plaintiffs' experts. Ford's rebuttal of this proof will involve not only its own mechanical and statistical evidence, but its efforts to impeach plaintiffs' case by attacking the individual reports and incidents underlying the systemic proofs. Rebuttal proof of alternative causes of these incidents would be the strongest possible refutation of plaintiffs' largely circumstantial proof of defect. Thus, causation will be put at issue by defendants, even if it need not be proved by plaintiffs, at this phase. *See* Ford Opposition at 130–31 n. 133.

Furthermore, proximate and factual causation are necessary predicates to the success of any single damage claim at the proposed second phase of the proceedings. While plaintiffs minimize the potential breadth of Ford's challenge to individual damage claims, Plaintiffs' Statement at 129, the Court of Appeals' implicit rejection of plaintiffs' "rebuttable presumption" theory,[25] 807 F.2d at 1006–07, portends a vig-

tached to the product") *and* Idaho Code § 6–1405(3)(a) (Supp.1987) ("'misuse' occurs when the product user does not act in manner that would be expected of an ordinary reasonably prudent person ...").

**22.** In "pure" comparative negligence states, a plaintiff's recovery is reduced directly by the amount of his or her negligence. *See, e.g., Sheldon v. Unit Rig & Equipment Co.,* 797 F.2d 883, 888 (10th Cir.1986), *cert. denied,* 479 U.S. 1090, 107 S.Ct. 1300, 94 L.Ed.2d 156 (1987); *Murphy v. Petrolane–Wyoming Gas Serv.,* 468 P.2d 969, 974–75 (Wyo.1970); *In re Certified Questions,* 416 Mich. 558, 331 N.W.2d 456 (Mich.1982) (applying pure comparative negligence statute, Mich.Stat.Ann. § 27A.2949 [M.C.L.A. § 600.2949] (Callaghan Supp.1987), to breach of warranty); *Fiske v. MacGregor,* 464 A.2d 719, 726–27 (R.I.1983) (allowing consideration of "pure" comparative negligence only where personal injury damages are sought).

**23.** Some states apply a fifty per cent comparative negligence law, which bars recovery by plaintiffs if their negligence is equal to or greater than the defendant's. *See, e.g., Haysville U.S.D. No. 261 v. GAF Corp.,* 233 Kan. 635, 666 P.2d 192, 199, 200–01 (Kan.1983) (applying comparative negligence statute, Kan.Stat.Ann., Section 60–258a (Supp.1987), to warranty actions

except those seeking "pure economic relief"); Ark.Code Ann. § 16–64–122 (1987) (comparative negligence statute that applies by its terms to breach of implied warranty).

Other states completely bar plaintiffs from recovering if their negligence is greater than the defendant's. If the plaintiff's negligence is less than the defendant's, then damages are reduced proportionally by the percentage of liability. *See, e.g., Peterson v. Bendix Homes Sys., Inc.,* 318 N.W.2d 50, 53–54 (Minn.1982) (applying comparative negligence statute, Minn.Stat. Ann. § 604.01 (West Supp.1988), to breach of warranty claim to reduce consequential damages).

**24.** *Compare Washington v. Morein Motor Co.,* 488 So.2d 325, 327 (La.App.1986) *and Fedders Corp. v. Boatright,* 493 So.2d 301, 309 (Miss. 1986) (awarding cost of repairs necessary to bring the goods in conformity with the warranty) *with Chag Oil Co. v. Gardner Mach. Corp.,* 500 S.W.2d 877, 878 (Tex.Civ.App.1973) (refusing to apply cost-of-repairs measures). *See also* Defendant's Opposition at 44–45, nn. 53–56.

**25.** This theory, which would allow plaintiffs to present adequate proof to establish a *prima facie* presumption that the alleged transmission defect at issue had caused any given park-to-reverse incident, had been approved in broad concept by the Court in the prior certification decision. *Walsh,* 106 F.R.D. at 399–402.

orous defense to causation proof in each instance. Affirmative defenses, such as contributory or comparative negligence (in the form of driver or third-party error, improper maintenance, product misuse or worn or damaged parts) also would be interposed at this phase. Ford Opposition at 130–31.

Thus, the complexities which this class action presents are not eliminated by the · facile solution of bifurcation. The overlap of causation, affirmative defenses and damage issues in this litigation make it particularly unsuited for bifurcation. *Compagnie Francaise D'Assurance v. Phillips Petroleum Co.*, 105 F.R.D. 16, 36–38 (S.D.N.Y.1984); *Payne v. A.O. Smith Corp.*, 99 F.R.D. 534, 536–37, 539–40 (S.D. Ohio 1983). *See also Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. at 265. Furthermore, the Court is concerned that individual causation findings will create an unmanageable second phase. *Windham v. American Brands, Inc.*, 565 F.2d 59, 70–72 (4th Cir.1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); *Osborne v. Subaru of America, Inc.*, 243 Cal.Rptr. 815, 198 Cal.App.3d 646 (1988) ("the difficulty in litigating individual damages claims remains a relevant consideration ... in determining whether maintenance of a class action is ultimately advantageous"). Thus, bifurcation is not the panacea which will allow this litigation to proceed.

### d) *Plaintiffs' Proposed Written Warranty Class*

Much of the Court's preceding analysis applies equally to the plaintiffs' proposed written warranty incidents class as to the proposed implied warranty classes. Proof involving twenty or more transmission configurations will be disputed by the parties. Consequently, disparate issues of fact will outweigh common factual matters. Individual damage claims will be contested inevitably by the defendants, and therefore, must be considered separately. And the interconnection of causation, affirmative defenses and damages issues makes bifur-cation infeasible.

In addition, the Court of Appeals has determined that state law lies at the base of all warranty claims, whether implied or written warranty, under Magnuson–Moss. *Walsh*, 807 F.2d at 1016. Therefore, state law guides the determination of whether a written warranty has been created. *Id.* at 1015. Issues such as notice or presentment of the defect, refusal of service and the measure of damages will be governed by the varying warranty laws of the relevant jurisdictions. Thus, this Court must conclude that the plaintiffs' proposed written warranty incidents class also fails to satisfy the predominance requirement.

### 2. Superiority

█ Finally, the Court must consider whether the class action device is superior to other available methods for the fair and efficient adjudication of this controversy. Rule 23(b)(3). In making this determination, the Court is mindful of competing concerns underlying the desirability of allowing the proposed class action to proceed.

Class actions recently have gained acceptability as a litigation tool designed to aid injured consumers in obtaining relief. Despite commentary by the Advisory Committee which counsels that " 'mass accidents' resulting in injury to numerous persons [are] ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting individuals in different ways", Fed.R.Civ.P. 23(b)(3), Advisory Committee Note (1966), courts have been increasingly willing to employ the class action device in the mass accident context. *See generally In re A.H. Robins Co., Inc.*, 880 F.2d 709, 725–27, 729–40 (4th Cir.1989) (discussing the development of class action law and the "proliferation" of class action suits in mass product liability cases) *cert. denied*, —— U.S. ——, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *But see In re Cadillac V8-6-4 Class Action*, 93 N.J. 412, 461 A.2d 736, 746 (N.J.1983) ("Courts have reached divergent results in determining whether to certify class actions in cases involving allegedly defective automobiles.")

Public policy justifications for the use of class actions may be particularly compelling where the harm to each plaintiff is too meager to pursue individual remedies. *See In re Cadillac*, 461 A.2d at 747–748.

However, these policy considerations must be weighed against the efficiency, practicality and ultimate fairness of certifying the proposed classes. In granting certification to a class of approximately 7,500 New Jersey purchasers of 1981 Cadillacs with V8–6–4 engines, the New Jersey Supreme Court declared in *In re Cadillac*, 461 A.2d at 748:

> In the final analysis, a class action should be viewed not only as a procedural device that enables plaintiffs with small claims to band together against a common adversary, but also as a means of providing a procedure that is fair to all parties and promotes judicial efficiency. The relevant considerations include, therefore, not only the interests of class members and other parties but also the effect of class certification on efficient judicial management.

That case and others like it which have granted class certification in litigation over allegedly defective automobiles, generally have involved limited factual or legal disputes. *Compare In re Cadillac*, 93 N.J. 412, 461 A.2d 736; *Joseph v. General Motors Corp.*, 109 F.R.D. 635 (D.Col.1986) (certification of all Colorado owners of 1981 Cadillacs with V8–6–4 engines); *General Motors Corp. v. Superior Court*, 196 Cal. App.3d 910, 242 Cal.Rptr. 365 (Cal.App. 1 Dist.1987) (denying right of appeal to certification order of trial court which granted certification to class of California purchasers of 1981 Cadillacs with V8–6–4 engines but denied certification to nationwide class) *with Osborne v. Subaru of America*, 243 Cal.Rptr. 815, 198 Cal.App.3d 646 (Cal. App.3d Dist.1988) (denial of certification to nationwide class of Subaru owners who purchased automobiles with an engine used in seven model years).

In contrast, the plaintiffs' proposed litigation embodies a trial court's nightmare of a litigation monster. Factual disputes over the four engine systems consisting of twenty-three or more component configurations employed in at least seventeen different models of Ford automobiles over five model years threaten to overwhelm the Court. Moreover, evidence of liability and causation will involve highly technical and complex mechanical and statistical studies which a lay jury will need to digest and comprehend. And when the myriad of factual permutations are piled upon layers of legal standards and choice of law dilemmas, this litigation appears to take on epic proportions. The Court is also wary that this litigation will degenerate into numerous trials within a trial resulting in confusion and possible injustice to the parties.

Given the sheer magnitude of the task, the Court concludes that the difficulties in managing this case as a class action are inevitable and insurmountable. Smaller scale, statewide class actions, such as those used by plaintiffs in the Cadillac V8–6–4 engine cases, would be a more practical solution to adjudicating the plaintiffs' claims.

## IV. *Conclusion*

Exhaustive review of the arguments and exhibits put forward by both parties and careful examination of cited authorities have convinced the Court that certification of plaintiffs' proposed classes is neither legally appropriate nor practically desirable. Non-common issues of fact and law predominate over substantial common issues. Class treatment promises gargantuan problems of manageability for counsel and the Court. Alternative judicial avenues offer a superior method of resolving the substance of plaintiffs' claims and providing appropriate relief. These reasons, and others woven through the preceding discussion,[26] lead the Court to conclude that plaintiffs' motion for class certification must be denied. Because the Court is unaware of any basis for maintaining the

---

**26.** The Court's discussion has not addressed the minutiae of all arguments advanced by each party; rather, it has treated only those issues the Court found dispositive of plaintiffs' motion.

pleaded claims absent class certification,[27] the Amended Complaint is dismissed.

---

**27.** Magnuson–Moss requires at least one hundred parties with claims of $25.00 or more to maintain class status. Plaintiffs have failed this requirement. To maintain even a single representative claim or group of related claims under diversity jurisdiction, plaintiffs with individual claims exceeding $50,000.00 would have to be identified. *See* 28 U.S.C. § 1332 (1982 & Supp. 1989) The Court is not aware of any named plaintiff with more than a fraction of that amount in controversy.