### In re GENERAL MOTORS CORPORATION PICKUP TRUCK FUEL TANK PRODUCTS LIABILITY LITIGATION.

#### MDL No. 961.

United States District Court, E.D. Pennsylvania.

Dec. 16, 1993.

## MEMORANDUM AND ORDER

YOHN, District Judge.

■ The parties in this multidistrict litigation have requested final approval for a proposed class settlement. For the reasons explained herein, the court approves the settlement as fair, reasonable and adequate.

### BACKGROUND

Plaintiffs, in these class action lawsuits [1], are owners of 1973 to 1987 model year General Motors Corporation ("GM") C/K full size pickup trucks and 1987 to 1991 GM R/V pickup trucks with fuel tanks located outside the frame rails. Plaintiffs claim this is a design defect increasing the danger of a post collision fire. The consolidated amended class action complaint alleges federal claims under the Lanham Trade-mark Act, 15 U.S.C. § 1125(a), and the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 et seq., as well as various state law claims including strict liability, fraud, unfair trade practices and breach of contract. It seeks compensatory and punitive damages for economic losses as well as injunctive relief. The complaint specifically excludes all claims for personal injury and wrongful death.

On July 19, 1993, plaintiffs filed a motion for authorization to disseminate notice to class members of the proposed settlement. In *Pretrial Order No. 7*, the court approved the motion to disseminate notice since the terms of the proposed settlement were sufficiently fair, reasonable and adequate for that purpose. *Pretrial Order No. 7* also certified the class for settlement purposes only. The settlement class consists of all persons or entities who purchased in the United States (except for the residents of Texas) and are owners as of July 19, 1993, of a 1973 to 1987 GM C/K full size pickup trucks or 1987 to 1991 GM R/V pickup trucks.

Plaintiffs subsequently filed an application for final approval of the class action settlement on September 15, 1993. Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the court conducted a hearing concerning the fairness of the proposed settlement on October 26, 1993. At that hearing, the court heard from plaintiffs' class counsel, GM and members of the settlement class on the fairness, reasonableness and adequacy of the settlement.

### THE SETTLEMENT [2]

Under the agreement of settlement, members of the settlement class will receive, on request, a $1,000 certificate toward the purchase of a new GMC or Chevrolet light duty truck. (Agreement ¶ 11A.). Settlement class members requesting a certificate that ultimately choose not to redeem it can transfer the full value of the certificate to either a family member or to a third party purchaser of the vehicle covered by the settlement. (Agreement ¶¶ 11E., 11F. and 11G.).

After negotiating the best possible deal for a new light duty truck, the holder of the $1,000 certificate will present the certificate to the dealer. (Agreement ¶ 11H.). The $1,000 certificate must be redeemed within 15 months of its availability. (Agreement ¶ 11B.). The $1,000 certificate does not require settlement class members to trade-in their current vehicle in order to use the

---

1. Many of the class action suits were transferred to the court by an order issued by the Judicial Panel of Multidistrict Litigation. The cases were transferred to the court for consolidated and coordinated pre-trial discovery proceedings.

2. The court will only highlight the essential terms in the agreement of settlement. Exhibit A to Pls' Mem. in Supp. of Mot. for Authorization to Disseminate Notice (Docket No. 79) contains the complete text of the agreement of settlement.

certificate toward the purchase of a new truck. (Agreement ¶ 11C.) The $1,000 certificate can also be used in conjunction with any other GM incentive program. (Agreement ¶ 11H.). Moreover, the $1,000 certificate can be used toward the down payment of an eligible light duty truck. (Agreement ¶ 11D.).

A settlement class member can also sell the certificate alone to a third-party, at which point the certificate becomes worth $500. (Agreement ¶ 11I.). The new $500 certificate is non-transferable and must be used within the original 15 month redemption period. (Agreement ¶ 11I(3)). The $500 non-transferable certificate cannot be used in conjunction with any other GMC or GMAC incentive offer. (Agreement ¶ 11I(4)).

The settlement resolves and dismisses claims arising from the alleged defect in the fuel tank placement. (Agreement ¶ 8 and 16). However, the settlement does not dismiss any claims for personal injury or death. (Agreement ¶ 8 and 16). Also, the settlement does not affect the rights of settlement class members to participate in any future actions GM may undertake as a result of the pending National Highway Traffic Safety Administration ("NHTSA") proceedings. (Agreement ¶ 17).

### DISCUSSION

■ Courts favor the resolution of disputes through voluntary compromise. *See Williams v. First National Bank,* 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910); *Petty v. General Accident Fire & Life Assur. Corp.,* 365 F.2d 419, 421 (3d Cir.1966). Therefore, it is well established that courts strongly encourage settlements. *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1314 n. 16 (3d Cir.1993).

■ Rule 23(e) of the Federal Rules of Civil Procedure requires court approval of any class action settlements:

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs.

Fed.R.Civ.P. 23(e). The approval of a proposed class settlement lies within the sound discretion of the court. *See Walsh v. Great Atlantic & Pacific Tea Co.,* 726 F.2d 956, 965 (3d Cir.1983); *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir.1975). The approval or disapproval must be based on the proposed settlement as a whole and as submitted. The settlement must stand and fall as a whole because the court may not re-write the agreement. *Davies v. Continental Bank,* 122 F.R.D. 475 (E.D.Pa.1988).

■ The court's function in approving the proposed class settlement is to determine whether the proposed settlement is "fair, adequate and reasonable" and in the best interests of the class members. *Walsh,* 726 F.2d at 965. When making this determination, the court must find that the settlement is substantively reasonable compared to the likely rewards of litigation. *Shlensky v. Dorsey,* 574 F.2d 131, 147 (3d Cir.1978); *Fisher Brothers v. Cambridge–Lee Industries, Inc.,* 630 F.Supp. 482, 487 (E.D.Pa.1985). The court should not substitute its judgment for that of counsel who negotiated the settlement. *Sommers v. Abraham Lincoln Federal Savings & Loan Ass'n,* 79 F.R.D. 571, 576 (E.D.Pa.1978).

The Third Circuit has identified the following nine factors as relevant to determining the fairness of a proposed settlement:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the proposed settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and,

(9) the range of reasonableness of the settlement fund to a possible recovery in light of the attendant risks of litigation.

*Girsh,* 521 F.2d at 157. The court will examine the relevant factors in making its determination of the fairness, reasonableness and adequacy of the proposed class settlement.

*Complexity, Expense and Duration of Litigation*

If the court were to disapprove the proposed class settlement, the complexity, expense and likely duration of the litigation would be mammoth. The litigation would be complex because sub-classes may need to be developed for various groups of truck owners and for various states who have differing state law applicable to the state law claims. Moreover, if the court dismissed the Lanham Act claim, it conceivably would have to remand some actions to state court because of a lack of jurisdiction.[3] Such litigation would create very substantial expenses for the parties as well as the judicial system. There would also be substantial delay in the recovery, if any, by the owners of already quite old vehicles if the proposed class settlement were not approved. Given the period for additional discovery, issues of class action certification, motions for summary judgment, trial of approximately three to four weeks, post trial motions and any appeals, it may be years before the litigation would be concluded. In sum, the court finds that this factor weighs in favor of the approval of the proposed class settlement.

*Reaction of the Class*

Pursuant to *Pretrial Order No. 7,* an individual notice of the proposed class settlement was mailed at GM's expense to each of the approximately 5.7 million class members. (*See* Aff. of Karen M. Surma, Ex. 1 to GM's Mem. in Resp. to Objections to Proposed Settlement). In response to this notice, approximately 6,450 pickup truck owners objected to the proposed class settlement. In addition, approximately 5,203 pickup truck owners elected to opt-out of the settlement class.

The Court of Appeals for the Third Circuit has held that silence may be construed as constituting tacit consent to the settlement agreement and strongly favors approval of the settlement. *Bell Atlantic Corp.,* 2 F.3d at 1313 n. 15. In this instance, the infinitesimal number of truck owners who have either objected to or sought exclusion from the settlement is less than one-fourth of one percent. Thus, the court finds that the approval or silence of more than 99% of the class members demonstrates that the vast majority of the class members favor the settlement. Moreover, approximately 44,800 owners have already designated family members to whom their $1,000 certificate should be assigned. The fact that so many people desire to transfer their certificate is affirmative proof that the vast majority of the class members approve of the settlement. Therefore, the court finds that the reaction of the class members strongly favors approval of the settlement.

*Stage of Proceedings and Discovery*

The parties signed the settlement agreement on July 19, 1993, approximately eight months after the first class action lawsuit was filed. Some objectors argue that the settlement is premature because class counsel have not performed sufficient discovery that would allow them to act reasonably with respect to negotiating the settlement. (Owens Objectors Mem. at 21; Jenkins Objectors Mem. at 7). However, the court does not find the objectors' argument to have a substantial bearing on this factor.

In this instance, class counsel reviewed extensive discovery on the same issues of product defect that was previously conducted in the various personal injury actions that have been litigated throughout the country. As a result of these efforts, class counsel represent that they have reviewed well over 300,000 pages of documents, over 100 volumes of deposition testimony, numerous volumes of trial testimony and several dozen videotapes of testimony and crash testing. (Plaintiffs' Application for Final Approval of Class Action Settlement at 11). Such discovery has always been available to the objectors' counsel. Also, class counsel reviewed many records in connection with NHTSA's investigation into the safety of the fuel tank

---

3. The problems with plaintiffs' Lanham Act claims are discussed more fully below in the section concerning the risks of establishing liability.

location as well as its own investigation into the loss of value of the trucks. Even if it can be argued that the parties entered into the settlement agreement early in the proceedings, it appears that class counsel performed substantial discovery, reviewed even more extensive discovery that had been conducted in prior similar litigation, and considered all of this discovery when negotiating the proposed class settlement. Thus, the court finds that this factor weighs in favor of approval of the settlement.

*Risks of Establishing Liability*

Liability in this case is hotly contested and the risks of establishing liability are clearly substantial. At the October 26, 1993, fairness hearing, class counsel gave an example of how risky establishing liability could be by pointing to the fact that of seven personal injury cases that have proceeded to trial against GM for accidents that occurred in trucks with fuel tanks outside the frame rails, plaintiffs have won four and GM has won three. Convincing a jury of liability in these cases, where no personal injury or death is present, would be even more difficult.

In this instance, plaintiffs argue that the location of the fuel tanks outside the frame rails seems intuitively to constitute an inferior design because it increases a vehicles exposure to side impact collision fires. (Pls' Supp.Mem. at 34). In addition to this common sense argument, the trial testimony of Ronald Elwell in *Mosely v. General Motors*, No. 90V–6276 (Fulton County, GA 1993), presents evidence which would bolster the plaintiffs' effort in proving GM's liability.[4] Elwell testified that in September, 1983, he first learned that GM had conducted approximately 21 car-to-truck side impact crash tests in order to analyze the outside the frame rail fuel tanks. (Elwell Test. at 20). The tests occurred from 1981 to 1983. (*Id.*).

When Elwell went to the test grounds, he viewed over twenty trucks that were smashed in the sides with split open fuel tanks. (*Id.* at 21–22). Elwell inferred that such testing would have required high level approval by GM because of the substantial expenditure involved in crashing such a large number of vehicles. (*Id.* at 31). Elwell further testified that Alexander McKeen, then GM's director of Engineering Analysis, informed him in September, 1983, that one of GM's in-house counsel had stated that because of the test results, GM had come to the conclusion that it could "no longer defend the product." (*Id.* at 24). Neither the parties nor the objectors presented any testimony or affidavits from McKeen or the unnamed in-house counsel, and presumably no such corroboration is available.

■ Contrary to the above evidence which supports the establishment of liability, GM raises numerous legal and factual issues as to why liability would be difficult for the plaintiffs to establish. Legally, GM contends that plaintiffs' claims for economic losses are barred by applicable state statute of limitations and/or repose. (*See* GM Class Opp. Mem. Ex. 20 for summary of various state limitation periods). The statute of limitations creates a problem for plaintiffs because it generally begins to run when the defect or fraud is discovered or should have been discovered by exercising ordinary diligence. *See Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (1983). GM argues that many plaintiffs had knowledge of the fuel tank location at or before the time they purchased their truck because GM had publicized the location of the fuel tanks in its C/K trucks with advertisements as early as 1973. Also, there has been publicity since the early 1980s on product liability litigation involving the same alleged defect. (GM Support Mem.Appx. Exs. 1–9, 11–14).

---

4. Ronald Elwell worked at GM for twenty-eight years. Elwell Test. at 3. While employed by GM, Elwell held a position in its Engineering Analysis department where he assisted GM's counsel in the defense of personal injury lawsuits involving the location of the C/K pickup truck fuel tank location. *Id.* at 4. Because of a dispute between Elwell and GM, Elwell was placed on "unassigned status" with pay by GM from Spring, 1987, to August, 1989. In 1991, Elwell and GM each filed suit against the other. The suits were eventually settled. GM obtained a permanent injunction from a Michigan state court that prohibits Elwell from testifying against GM without its permission. *See Elwell v. General Motors Corp.*, No. 91–115946NZ (Wayne County, Mich., Aug. 26, 1992).

Plaintiffs also face the legal problem that their Lanham Act claims may fail because consumers have been held to lack standing to pursue such a claim for failure to have a commercial interest. *See Serbin v. Ziebart Int'l Corp., Inc.,* 11 F.3d 1163 (3d Cir.1993); *Loy v. Armstrong World Industries, Inc.,* 1993 WL 475513 (E.D.Pa. Nov. 15, 1993). Dismissal of this federal claim may necessitate the court remanding some actions to state court because the court would no longer have subject matter jurisdiction over those actions.

■ A further legal problem facing many of the plaintiffs is that their Magnuson–Moss Warranty Act and implied warranty claims may fail for lack of vertical privity. Many class members are not in privity with GM because they purchased their trucks from independent dealers or other third parties. A lack of privity in many states can act as an absolute defense to actions for breach of implied warranty seeking economic damages. (*See* GM Supp.Mem. at 33–34 for states affected and the applicable case law).

Factually, GM points out that statistical evidence does not support plaintiffs' claim that the fuel tank location on the C/K pickup trucks is unsafe. A statistical analysis presented by GM concerning side collisions in various scenarios involving fires, fatal injuries or major injuries, and combinations thereof demonstrates that the C/K pickup truck compares favorably with Ford and Dodge trucks of the same size for the same model years. (*See,* Lange Aff. ¶¶ 8–30 and Attach. B–G, Ex. 21 to GM's Supp.Mem.). In addition, GM points out that when it moved the fuel tanks on the C/K pickups from the right-passenger side to the left-driver side in 1981 that, contrary to general expectations, there was no change exhibited

in the fatality rate for the vehicles. (Lange Aff. ¶ 24 and Attach. J, Ex. 21 to GM's Support Mem.). Moreover, GM points to statistics concerning fatal fire rates of "twin vehicles." Twin vehicles are vehicles which essentially have the same design but are marketed under different company names.[5] GM's statistical analysis of twin vehicles demonstrates that it is not uncommon for one twin vehicle to have a much higher occurrence of fatal accidents than the other twin because of driver demographics. (Lange Aff. ¶ 27, Ex. 21 to GM's Supp.Mem.). C/K pickup trucks do not have a twin vehicle relationship with Ford trucks; however, statistics indicate that the range of variation for fatal fire rates for these two types of trucks is comparable to that of vehicles with twins.[6] (*Id.*).

In sum, the court finds that there appears to be a substantial risk in establishing liability because of the complexity and size of case along with the legal and factual problems raised by GM. Thus, the court concludes that this factor weighs in favor of approval of the proposed class settlement.

*Risks of Establishing Damages*

■ The proposed class settlement is a settlement of only the plaintiffs' economic claims. Perhaps the greatest weakness in the plaintiffs' case is the lack of proof of economic damages. An analysis of the *Kelly Blue Book,* recognized as one of the most reliable sources as to a vehicle's value, reveals that in spite of all the adverse publicity about possible safety defects that GM's pickup trucks have received over the past years, there has been no diminution in the value of the C/K pickup trucks relative to comparable Ford and Dodge trucks. (*See,* Pls' Supp. Mem., 28–34 and Ex. B). The objectors presented no countervailing evidence to the *Kel-*

---

**5.** Examples of such twin vehicles are the Chrysler minivans, Plymouth Voyager and Dodge Caravan.

**6.** In Attachment L to the Lange Affidavit, a statistical analysis is presented showing the fatal fire rates among various vehicles because of side impacts. According to this analysis, almost all passenger cars have a greater fatal fire rate than do the C/K pickup trucks. GM also points out that medium and heavy duty trucks still utilize fuel tanks mounted outside the frame rails.

(Sinke Aff. ¶ 8, Ex. 20 to GM's Support Mem.). Although this information may be of great interest to those who own or are considering purchasing C/K pickup trucks and want to be aware of the relative risks vis a vis other vehicles, the court does not find this information relevant to its consideration of the risks of establishing liability in the case at issue since these other vehicles are of a substantially different design than the C/K pickup trucks.

ly *Blue Book* statistics which would suggest that GM pickup truck owners have suffered any economic loss at all because of the fuel tank location.[7] Instead, some objectors claim that if other legal theories were offered, the class would receive between one billion to five billion dollars. However, optimistic forecasts and large demands for damages should be given little weight in approving a settlement of unpredictable litigation. *See, Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 682–83 (7th Cir.1987); *TBK Partners, Ltd. v. Western Union Corp.*, 517 F.Supp. 380, 389 (S.D.N.Y. 1981). Thus, because the plaintiffs cannot adequately prove diminished value, the court concludes that risks of proving damages weigh strongly in favor of approval of the proposed class settlement.

*Risks of Maintaining Class Status*

■ The party moving for certification bears the burden of proving that the requirements of Fed.R.Civ.P. 23 for certifying a class action have been met. *Zlotnick v. TIE Communications, Inc.*, 123 F.R.D. 189, 190 (E.D.Pa.1988).

Pursuant to Rule 23, a party seeking class certification must first satisfy all the prerequisites of Rule 23(a). Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). If the party seeking class certification satisfies the four prerequisites of Rule 23(a), that party must also establish that one of the three subsections of Rule 23(b) has been met.

Since the start of this litigation, GM has vigorously contested the ability of the plaintiffs to maintain a class action throughout trial. GM consistently has claimed that class certification is inappropriate because of the myriad factual and legal issues raised by the plaintiffs' amended complaint. (*See* GM Class Opp'n.Mem. filed June 28, 1993). Such factual and legal issues that may cause class certification problems include: (1) state law claims such as breach of warranty, negligent misrepresentation, negligence and products liability may involve the application of the differing laws of all 50 states; (2) the fact that C/K pickup trucks do not involve a single fuel tank system design (Sinke Aff. ¶¶ 14, 26, Ex. 20 to GM's Support Mem.); and (3) individualized proof of reliance or knowledge for claims such as fraud, negligent misrepresentation and breach of warranty.

Class counsel acknowledge that some difficulty may exist in certifying certain claims. The objectors do not adequately show that maintaining class status is a certainty. Thus, the court concludes that a risk exists in maintaining class certification. Therefore, this factor weighs in favor of approval of the proposed class settlement, although not heavily.

*GM's Ability to Withstand a Greater Judgment*

If this action were to proceed, the court finds that GM, because of its size and financial condition, could withstand a judgment greater than the proposed settlement. The court concludes that this is not a factor which it would consider either weighing for or against approval of the proposed class settlement under these facts.

*Reasonableness of Settlement in Light of Best Possible Recovery*

■ A court must review a settlement to determine whether it falls within a range of reasonableness and not simply whether it is the most favorable response possible. *See, Newman v. Stein*, 464 F.2d 689, 693 (2d

---

**7.** If economic damages were the only relief sought by the plaintiffs, court approval of the settlement would be routine since the plaintiffs would be receiving something of value for damages they cannot prove. However, as will be addressed more fully below, plaintiffs in their amended class action complaint also sought injunctive relief in the form of a recall and/or retrofit.

Cir.1972); *Davies v. Continental Bank*, 122 F.R.D. 475, 480 (E.D.Pa.1988). In light of the difficulties in establishing damages, it could be argued that any type of economic recovery is in the best interest of the class. However, many objectors attack the adequacy or reasonableness of the proposed class settlement. The court will examine the merits of these objections.

### (a) *Economic Value of Settlement to Class Members*

A number of the objectors claim that the proposed class settlement does not provide adequate economic value to settlement class members. The greatest obstacle to these objections is that there is no proof that settlement class members have sustained any economic loss at all. Moreover, as the court will note below, each objection can be individually refuted.

One argument made by the objectors is that the settlement provides no greater benefit than a person can obtain through the GM credit card rebate program (Jenkins Objectors Mem. at 11). This argument fails since a person would have to make credit purchases of approximately $20,000 to obtain a $1,000 discount toward the purchase of a GM vehicle while the settlement certificates can be used toward the purchase of a new vehicle without requiring any credit purchases. Even more importantly, the settlement certificates may be stacked with the credit card rebate so that the purchasers will obtain the benefits of both programs.

Another argument made by objectors is that they would prefer a cash settlement since they do not desire to purchase another GM vehicle. However, based on the objections the court has reviewed, this number appears to be minuscule. Objectors also claim that the settlement does not supply an adequate value to those who are unable to purchase a new GM vehicle with the settlement certificate. (Wilson Objectors Mem. at 3). Although this objection comes from a substantial number of class members, it ignores the fact that the settlement allows these people to sell their certificates to others for cash.

The court has also reviewed the various submissions of all the parties that have attempted to determine the economic value of the settlement. The court finds the economic value analysis prepared by Dr. Simonson [8] to be the most thorough and reasonable one performed on this issue. (Simonson Aff., Ex. 10 to Pls' Further Supp.Mem.).

Simonson bases his analysis on a market research poll of the class members in this action to determine the predictive level of certificate utilization. (*Id.* ¶¶ 41–43). The court notes that Simonson's analysis is the only one that used such a marketing research poll. Based on his discount of the results of the survey-based poll, Simonson estimates that 34 to 38 percent of the class members will utilize the $1,000 certificate. (*Id.* ¶ 43). Thus, the economic value of the $1,000 certificates is between $1.824 billion and $ 2.024 billion. (*Id.* ¶ 44). Simonson also estimates that an additional 11 percent of the class members will sell their certificates which will then be worth $500.[9] When computing the economic value of the $500 certificates, Simonson assumed that the value to the certificate seller is $250 since the buyer and seller will split the value of the certificate. Hence, the economic value of the $500 certificates is $0.157 billion. The above results suggest a conservative total redemption rate between 45 percent and 49 percent that will yield a total economic value for class members between $1.98 billion and $2.18 billion. Based on this value, the court concludes that a very substantial portion of class members will re-

---

8. Dr. Itmar Simonson is a professor of economics at Stanford University and a noted authority in the field of perceived value. Dr. Simonson performed the economic value of settlement analysis adopted by the court in *In re Domestic Air Transp. Antitrust Litigation*, 148 F.R.D. 297 (N.D.Ga.1993).

9. The total estimated percentage of usage of both the $1,000 and $500 certificates by Simonson is consistent with the survey performed by Donald D. Nichols, Ed.D. (Docket No. 218). The Nichols' survey estimates that 46% of the certificates available for use by Texas class members will be redeemed. However, the court does not rely on the Nichols survey for anything other than corroboration of Simonson since his sampling is limited to Texas and it has less factual support than the Simonson survey.

ceive an economic benefit and thus it is a reasonable settlement.

### (b) *Effect of Transferability on Settlement Value*

Several objectors complain that the certificates are not freely transferable to others. (*Eg.* Owens Objectors Mem. at 15–17). In particular, the objectors contend that assignment is too restricted since the transferred certificates only apply toward the purchase of certain GM vehicles and they cannot be used in conjunction with other GM incentive programs. Likewise, the objectors contend that it will be administratively cumbersome for class members to assign their certificate to another and that no secondary market will develop that will enable them to sell their certificates. (Schoenfeld Aff., Docket No. 196; Bloom Aff., Young and Center for Auto Safety Objectors Mem.; Owens Objectors Mem. at 14–15).

Contrary to the objectors' argument, Dr. Simonson's analysis indicates that a secondary market will develop for the certificates. Simonson reasons that a business will enter the secondary market of matching buyers and sellers because there are such a large number of certificates outstanding which could be sold and generate a significant profit for that business, even if the business only made a small profit on the transfer of each individual certificate. (Simonson Resp. Aff. ¶ 8). Also, because the potential economic value the certificates will have to class members is substantial, the court does not find that the restrictions on transferability render the settlement unreasonable or inadequate.

### (c) *Effect of Truck Production on Settlement Value*

Because of GM's truck production capacity, many objectors argue that too many certificates will be chasing too few vehicles. The objectors contend that the effect of this scenario is that it will limit the value of the certificates. (Wilson Objectors Mem. at 1–3; Owens Objectors Mem. at 5–6; Young Objectors Mem. at 13–15).

GM counters this objection with the affidavit of Guy D. Briggs, Vice President of General Motors and Group Director of Operations, North American Truck Platforms. (Ex. 4 to GM's Further Support Mem.). According to the Briggs' affidavit, GM manufactured and sold approximately 1.8 million light-duty pickup trucks in 1993. By adding additional shifts, overtime and with some tooling of existing facilities, GM could produce approximately 3 million light-duty trucks in the fifteen month redemption period. If demand during the redemption period proves to be even greater than 3 million, GM could meet the demand by opening currently unused manufacturing plants. If Dr. Simonson's well reasoned analysis proves to be correct, GM's demand for new trucks during the fifteen month period would be 3,390,000 [10]. (Simonson Resp.Aff. ¶ 3). Thus, GM would only have to produce 390,000 vehicles in its currently unused plants. Moreover, paragraph 11J of the Settlement Agreement protects class members from a shortage of vehicles by providing that if any class member orders a new vehicle during the redemption period, but GM is unable to deliver the vehicle within that period, the certificate will be honored whenever the class member takes delivery. Thus, the court does not find that GM's production capacity will have such an effect of the economic value of the settlement agreement as to make the settlement unreasonable.

### (d) *Effect of Unilateral Acts by GM on the Settlement Value*

The objectors have expressed concern that through certain unilateral acts, such as price increases or the reduction of incentive programs, GM could negate the value of the certificates to the class members. (Center for Auto Safety and Young Objectors Mem. at 14–17; Owens Objectors Mem. at 7). The court agrees that with an increased demand for trucks covered by the settlement, GM will probably not offer as many incentives and rebates. However, the court will continue to maintain jurisdiction over the enforcement of the settlement so that it can ensure GM's

---

**10.** Simonson estimates that normal demand for GM trucks during the 15 month period will be 2.25 million. This number is based on the 1.8 million trucks sold in 1993 multiplied by 15/12.

Simonson also estimates that 20 percent or 1.14 million class members will represent additional demand. By adding these numbers, Simonson arrives at his estimate of 3,390,000.

good faith compliance. In addition, because the automobile industry is extremely competitive (See, Whishner Aff. ¶ 9, GM Mem. in Opp. to Prelim.Inj.), GM will not want to lose any customers without certificates to its main truck rivals, Ford and Dodge. In order for GM to remain competitive with its rivals, its trucks must remain competitively priced. Thus, during the redemption period, GM will be under inherent market pressure to maintain prices, incentives and rebates. In sum, market pressure and the fact that the court will retain jurisdiction over the settlement will prevent GM from performing unilateral acts which could negate the value of the settlement.

### (e) Effect of Dealers' Actions on Settlement Value

A problem raised by the objectors that is similar to the unilateral acts of GM is that dealers may no longer sell the vehicles covered by the settlement at the same discount prices· because of the increased demand. (Owens Objectors Mem. at 6–8). The primary support for the objectors contention is the affidavit of Bernerd Bogar, Ph.D. (Docket No. 185). Under Bogar's scenario, approximately 60% of the class members will utilize their certificates and all 60% will represent additional demand for new trucks. (Bogar Aff. ¶¶ 7–8). Because of the increased demand for new trucks, he concludes the price for new trucks will increase, possibly even above the manufacturer suggested retail price. (Id. at ¶¶ 10–11). Also, because of the increased demand, Bogar predicts that dealers will assume all new truck purchasers have a certificate and either not negotiate at all on the price or not discount the price of a new truck to the same extent as is being done today. (Id. ¶¶ 22–26).

The court does not find Bogar's analysis on this issue to be reasonable. Instead, the court once again returns to Dr. Simonson's analysis. Simonson estimates that 20% of the class members will represent additional demand for new trucks while the rest of the class members who choose to utilize the cer-

tificates would have purchased a new vehicle during the redemption period without the certificate. (Simonson Response Aff. ¶ 2). Because additional demand will not cause a great discrepancy between supply and demand, prices will not rise as much as Bogar estimates. (Id.). Moreover, Simonson states that buyer behavior research shows that consumers have an expectation of what is a fair price for the new vehicle and will still attempt to negotiate the best fair price from the dealer. (Simonson Aff. ¶ 23, Ex. 10 Pls' Further Supp.Mem.).

In sum, the court has no doubt that dealers who are currently selling the new vehicles covered by the settlement at a certain amount over dealer invoice will attempt to sell the same vehicles at a higher amount over dealer invoice. during the redemption period. However, this increase will be tempered by the need to stay competitive with dealers of other truck manufacturers who will not have increased demand because of the settlement. In fact, it is conceivable that the other dealers may offer special incentive or rebate programs of their own in order to compete with the certificate offered by this settlement so that they can maintain their market share for new trucks. The exact effect that dealer actions will have on the proposed class settlement is imponderable at this time. However, given the fact that the class members have suffered no economic losses, the certificates will still retain enough economic value to constitute a reasonable settlement no matter what individual dealers may do.

### (f) Governmental Entities

Several governmental entities have filed objections to the proposed class settlement because they contend that they are not capable of replacing all the trucks within their fleets during the fifteen (15) month redemption period because of budgetary constraints.[11] However, the court does not find any difference between this difficulty and that of individual truck owners who will not be able to afford a new vehicle during the

---

11. Examples of the governmental units that have objected are; State of Iowa; State of Indiana; West Virginia Department of Transportation; State of New York; Commonwealth of Pennsyl-

vania Department of Transportation and the Department of General Services; County of Los Angeles, California; Jefferson Parish, Louisiana; and the City of New York.

same time period. Thus, like the individual owners, any certificates which the governmental entities cannot use during the fifteen month redemption period can be sold to another entity or person.

Many governmental entities also object to the settlement because they believe that they will not be able to utilize the certificates because of their competitive bidding requirements. The court is confident that ingenious counsel will be able to structure bidding requirements so that the governmental entities can take full advantage of the certificates. Also, like those governmental units and individuals with budgetary constraints, any unused certificates can be sold to another entity of individual.

(g) *Use of Settlement in Future Litigation*

 The objectors contend that based on the language in the settlement, "GM could argue in future personal injury litigation that a class member who had knowledge of the settlement and failed to either opt out of the class or seek exclusion from the settlement had assumed the risk" and is therefore barred from bringing a personal injury claim. (Owens Opposition Mem. at 10–11). In particular, the objectors rely on paragraph 2 of the Agreement of Settlement which provides:

> This agreement shall not be offered or be admissible in evidence against General Motors or cited or referred to in any action or proceeding except in any action or proceeding brought by or against named plaintiffs, settlement class members, or General Motors to enforce its terms, or by General Motors in defense of any claims brought by settlement class members.

The court agrees with the objectors that this language is ambiguous enough that it could be interpreted as they have suggested. However, class counsel at the October 26, 1993, fairness hearing and in their memorandum in further support stated that the objectors' interpretation is incorrect and that paragraph 2 was never intended as an assumption of the risk defense. Instead, class counsel stated that paragraph 2 is only intended to apply if a class member brings a suit based on this settlement. (Pls' Further Supp.Mem. at 35–36). At no time has GM ever objected to class counsel's interpreta-

tion. Since GM has never objected, the court concludes that it agrees with this interpretation by class counsel and the court adopts class counsel's interpretation of paragraph 2 so that future personal injury plaintiffs who participated in this settlement will not be considered to have assumed the risk.

In conclusion, although the settlement could always have been for a higher amount or contained less restrictive conditions, it is clearly within the range of reasonableness in light of the best possible recovery. Indeed, although the objectors devoted most of their efforts to explaining why they should obtain "more", they never addressed the issue of why they should receive anything for a diminution in economic value of the trucks since there was absolutely no proof of such diminution.

### Range of Reasonableness in Light of Risks of Litigation

The court also finds that the proposed settlement falls within the range of reasonableness in light of all the attendant risks of litigation. As discussed *supra.*, the issues of liability are hotly contested and liability will be difficult to establish. Also, some difficulty could arise as to maintaining a class action. But, even if the court were to presume liability and maintenance of the class, the plaintiffs' greatest weakness is their inability to establish the existence of economic damages. There are also two other factors which firmly place the proposed settlement within the range of reasonableness: (1) class members are not precluded from bringing subsequent personal injury suits; and (2) class members can fully participate in any action ordered by NHTSA. Thus, the court concludes that the settlement is within the range of reasonableness in light of the attendant risk of litigation and this factor weighs in favor of approving the settlement.

### The Safety Factor

While most of the efforts of the parties and objectors were devoted to the economic issues in the complaint, the court is more concerned with the safety factor. Specifically, although the proposed class settlement provides a substantial financial benefit to the class, it does nothing to remedy the alleged

safety hazard of the trucks relating to the location of their fuel tanks. GM, of course, continues to deny that any safety hazard exists in its trucks. Clearly, all but a relatively small portion of the public agrees with GM's position because the court has not received objections from a large number of persons or entities raising a safety concern. However, even with such substantial agreement on this position, the court's concern stems from the fact that the basis for this lawsuit, an alleged defect in the GM pickup trucks, has not been addressed by the settlement.

Unfortunately, no objector that complains that the settlement fails to retrofit the alleged defect has been able to come forth with a practical and safe modification for the trucks that has been designed, evaluated and tested. (Eg. Jenkins Objectors Mem. at 8; Owens Objectors Mem. at 18; Center for Auto Safety Objectors Mem. at 18). Moreover, even if such a retrofit existed, the court may not have the power to order a recall to effect the retrofit.

The affidavits of Messrs. Weil and Schmidt that are presented by the objectors suggest that the fuel tank could be moved inside the frame rail to where the spare tire is located on the C/K pickup trucks. (Weil Aff. ¶ 8; Schmidt Aff. ¶ 5, Attachments to Center for Auto Safety Objectors Mem.). However, as the Sinke affidavit points out, moving the gas tank to the location of the spare tire creates its own dangers. (Sinke Aff. ¶ 6, Ex. 2 of GM's Further Supp.Mem.) This move would increase the risks in rear collisions because C/K trucks are not designed to meet federal safety standards for a rear fuel tank. (Id.). Moving the tank to the rear would also create a problem in that there would be insufficient ground clearance for the 40 gallon fuel tank. (Id.). Another problem with the suggested fuel tank move is that the tank would be located too close to the exhaust system, an inherently dangerous situation. (Id.) Moreover, the movement of the fuel tank would also necessitate the rerouting of the filler neck and hose which could also lead to the potential for substantial fuel leaks upon separation from the tank. (Id.) A further problem is that the fuel line from the tank to the

engine would have to be longer which could also cause more fuel line ruptures. (Id.) Finally, if the moved fuel tank had less capacity than the present fuel tank, individual owners would attempt to add their own supplemental tank. The supplemental tank could potentially create a more dangerous situation than that allegedly faced by the present location of the fuel tank. Thus, the court does not believe that this suggested solution is viable.

The Arndt Affidavit suggests that the installation of a new tank with a rubber bladder inserted inside would fix the claimed problem by lessening the amount of fuel spilled if the tank were to rupture. (Arndt Aff. ¶ 8, Attach. to Center for Auto Safety Objectors Mem.). At the October 26, 1993, fairness hearing, the court was informed that a bladder was used in the fuel tanks of 1975 to 1978 Chevrolet Corvettes. However, GM represented at the hearing that it stopped using the bladder due to clogging, leaking and cracking problems. Since the time the bladder was used in the Corvettes until today, no manufacturer has used a bladder. Also, the Sinke affidavit states that no manufacturer has ever mass-produced a bladder while preserving the normal functions of the fuel tank. (Sinke Aff. ¶ 8). Moreover, no design or testing has been produced which shows that the use of a bladder would increase the safety of the pickup trucks. Thus, the bladder would not be a feasible solution at this time.

A final fix offered by the objectors in order to enhance the safety of the pickup trucks is the installation of a metal shield or cage. (Arndt Aff. ¶ 7; Weil Aff. ¶¶ 4–7). The Sinke affidavit states that GM designed, tested and applied a partial cage on its 1978 to 1983 C/K cab chassis to provide fuel tank protection. (Sinke Aff. ¶ 7). Since the cab chassis is an incomplete vehicle that has no bed or body structure behind the cab, the partial cage was used to provide fuel tank protection similar to that provided by the pickup truck bed. (Id.). The Sinke affidavit states that these devices have only been tested on cab chassis, which has a difference in design from C/K pickup trucks. (Id.). Also, the Sinke affidavit states that no tests results have ever been

done which show that the cage or shield design would enhance the safety of the fuel system in side impact collisions or that it would even be appropriate for installation in pickup trucks. (*Id.*). However, unlike the other proposed fixes, no intuitively credible explanation has ever been offered as to why these devices would not work in pickup trucks.

The Weil affidavit offers some anecdotal evidence that a cage has been successfully installed around the fuel tanks of various GM C/K pickup trucks by individual owners.[12] (Weil Aff. ¶ 4–5). Weil believes this can easily be done since some of the trucks already have pre-drilled bolt holes available to which the cage can be attached. However, the Sinke affidavit states that the pre–1978 C/K pickup trucks lack the holes Weil used and that drilling holes into a vehicle of that age would either damage the fuel tank or cause leaks and corrosion. Obviously, before a nationwide recall could be seriously considered on the cage or shield fix, extensive testing would have to be done in order to ensure that the cage or shield enhances safety and does not create more problems than it solves.

The objectors also suggest that independent businesses could become involved in designing a possible retrofit if the settlement were modified so that the certificates could be used toward repair costs that enhance the safety of the fuel tanks (Ditlow Aff. ¶ 28, Attach. to Center for Auto Safety Objectors Mem.). The court does not believe that such a modification to the agreement should be made for two reasons. First, none of the businesses would have designed or tested the fuel tank modifications in a broad range of impact conditions. (Sinke Aff. ¶ 9). Second, to encourage the application of independently designed retrofits without proper testing would be extremely dangerous. (Sinke Aff. ¶ 10). Moreover, as the court previously explained, the authority of the court is to either approve or disapprove the settlement agreement as a whole, not modify it. Thus, the court will give no weight to the independent

business argument advanced by the objectors when weighing the fairness of the proposed class settlement.

Since neither the plaintiffs nor the objectors have been able to come forward with a retrofit plan that has been deigned and tested to enhance safety, the objectors suggest that the court order GM to design, evaluate and test a suitable retrofit. Once this is completed, the objectors want the court to order a remedy sought in the amended class action complaint, a recall by injunction to install whatever modification is found to work. (Owens Objectors Mem. at 18; Center for Auto Safety Objectors Mem. at 18–21 and its oral objections at the Oct. 26, 1993, fairness hearing). The objectors theorize that if GM designed a retrofit, the ultimate costs for the retrofit would be minimal since any retrofit could be mass produced with precise instructions on how to make the repairs. (Ditlow Aff. ¶¶ 20–23.)

Contrary to the objectors' suggestion, GM has always maintained that even if the plaintiffs were able to prove the merits of their case, the court could not order a recall by injunction. In particular, GM cites to *Walsh v. Ford Motor Co.*, 130 F.R.D. 260 (D.D.C. 1990), where the court recognized the difficulty in ordering a recall since it would demand "more resources and supervision than the court can muster reasonably, and thus threaten[ing] to create an award which is either incapable of full and effective enforcement or uncertain to provide full relief." 130 F.R.D. at 266. Moreover, in *National Women's Health Network, Inc. v. A.H. Robins Co.*, 545 F.Supp. 1177 (D.Mass.1982), the court stated that "[N]o court has ever ordered a notification and recall campaign on the basis of state law." 545 F.Supp. at 1180. The objectors have not directed the court to any case which would support a court ordered recall in a private action. Moreover, the court does not know of any case which would support its ordering a recall. The uncertainty of a legal basis for a recall by

---

12. The Jenkins objectors cite to the testimony of Ronald Elwell for the proposition that some fixes could be installed relatively cheaply. (Jenkins Objectors Mem. at 8). Elwell's testimony at pages 104–114, 143–149, 164, 226, 228, 321–324 and 405 discusses the use of either a steel or plastic shield. However, the court does not find that Elwell's testimony demonstrates that testing of these devices on C/K pickup trucks proves that they will enhance safety.

injunction after a court-ordered design, evaluation and testing of a retrofit, coupled with the uncertainty that a court would ever order such a recall if it had the authority, further supports the court's approval of the proposed class settlement.

■ Congress has established a forum to resolve recall and retrofit issues in NHTSA. NHTSA was established pursuant to the National Traffic and Motor Vehicle Safety Act (the "Act"). 15 U.S.C. § 1381, et seq. . The proposed class settlement does not affect the rights of settlement class members to participate in any recall that NHTSA orders. (Agreement ¶ 17).

NHTSA began examining the safety of GM's fuel tank designs for the pickup trucks involved in this action on August 14, 1992, at the urging of two public advocacy groups. NHTSA announced that it was opening formal investigations into GM pickup trucks on December 8, 1992. On April 9, 1993, NHTSA wrote to GM and asked that it voluntarily recall the pickup trucks because it believed that the fuel tank designs on the pickup trucks were defective. On April 30, 1993, GM announced that it would not voluntarily recall the pickup trucks since it believed the fuel tank designs were safe. NHTSA's investigation into the fuel tank designs of the GM pickup trucks is still proceeding.

The objectors argue that the parties' attempt to defend the proposed class settlement on the basis that settlement class members can participate in a NHTSA recall is illusory. (Center for Auto Safety Supplemental Mem. at 2). The objectors believe it is illusory because NHTSA can only require a manufacturer to provide a remedy without charge to a vehicle that was purchased by the first purchaser within eight calendar years of the investigation. 15 U.S.C. § 1414(a)(4). Because of this eight year limitations period, the objectors contend that a recall would only affect approximately 550,000 of the pickup trucks involved in this action. (Ditlow Decl. ¶¶ 4–6, Center for Auto Safety Supplemental Mem.). GM believes that 850,000 to 900,000 pickup trucks would be covered by a NHTSA recall. Regardless of whose number is believed, the court finds the small number of class members whose pickup trucks would be covered by a NHTSA recall obviously limits the effectiveness of that remedy. However, as the court previously discussed, all the plaintiffs may have statute of limitations problems in this action that may be equally as severe or worse than the eight year NHTSA limitation. Moreover, in the event that NHTSA were to order a recall of the pickup trucks it has the authority to recall, GM would be faced with enormous public pressure to recall the other pickup trucks as well. Thus, the court concludes that NHTSA, rather than the court, provides the more appropriate forum for any possible recall/retrofit remedy.

## CONCLUSION

The court finds that a balancing of the nine *Girsh* factors and an evaluation of the safety concerns and remedies weigh in favor of approval of the settlement. Thus, the court approves the settlement as fair, reasonable and adequate.

An appropriate order follows.

### FINAL ORDER AND JUDGMENT

Having considered the Agreement of Settlement dated July 19, 1993, including the exhibits annexed thereto ("Agreement"); the Class Action Settlement Notice ("Notice") having been duly given in accordance with the prior order of this court; a formal hearing having been duly noticed to counsel on July 20, 1993 and to the class members on August 20, 1993, and a hearing having been held on October 26, 1993, for the purpose of determining whether the terms of the Agreement are fair, reasonable, and adequate and should be approved by the court in full settlement of the above-captioned litigation; having heard the attorneys for the parties in support of the Agreement and having considered any objections submitted to the court; and upon all papers filed and proceedings had herein; and good cause having been demonstrated to this court's satisfaction under the standards of Fed.R.Civ.P. 23:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. The court hereby approves the terms of the Agreement, attached hereto as Exhibit "A" and incorporated herein for all purposes, as fair, reasonable, and adequate and directs consummation of all its terms and provisions.

2. Notice has been given to all settlement class members known and reasonably identifiable in satisfaction of the requirements of Fed.R.Civ.P. 23(b)(3), (c)(2) and (e); and due process.

3. The prior provisional certification of the settlement class pursuant to Fed.R.Civ.P. 23(b) is hereby confirmed for purposes of the settlement approved by this order. The settlement class is defined as:

All persons and entities who purchased in the United States and are owners as of July 19, 1993 of any of the following "GM full-size Pickup Trucks":

(i) one or more 1973 through 1986 model year General Motors full-size pickup truck or chassis cab models of the "C" or "K" series. These include the following models: Chevrolet C10, C20, C30, K10, K20, K30 and GMC Truck C1500, C2500, C3500, K1500, K2500, K3500;

(ii) one or more 1987 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series. These include the following models: Chevrolet R10, R20, R30, V10, V20, V30 and GMC Truck R1500, R2500, R3500, V1500, V2500, V3500;

(iii) one or more 1988 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series. These include the following models: Chevrolet R20, R30, V20, V30 and GMC Truck R2500, R3500, V2500, V3500;

(iv) one or more 1989 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series. These include the following models: Chevrolet R2500, R3500, V2500, V3500 and GMC Truck R2500, R3500, V2500, V3500; or

(v) one or more 1990 or 1991 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series. These include the following models: Chevrolet R3500, V3500 and GMC Truck R3500, V3500.

Excluded from the settlement class are residents of the State of Texas, who are part of a separate identical class action settlement in Texas state court.

4. The action is dismissed on the merits with prejudice as to all settlement class members who did not request exclusion from the settlement class in the time and manner provided in the Notice, without costs to any party. General Motors Corporation ("General Motors"), its present or former officers, directors, employees, agents, heirs, executors, administrators, successors, reorganized successors, assigns, subsidiaries, affiliates, parents, divisions, predecessors, and authorized dealers shall be, and the same hereby are, released and discharged from any and all claims, causes of action, and liability whatsoever alleged or asserted or which could have been alleged or asserted on behalf of settlement class members arising out of, or in any way relating to the design, manufacture, and placement of the fuel tanks outside the frame rails and all related fuel system designs and components, including fuel lines, fuel pumps, fuel filler neck, fill cap, fuel tank shields, attachment devices, and surrounding structure and components in the GM pickup trucks, excluding claims for damages arising out of any vehicle crashes that result in personal injury or death. Nothing contained in the Agreement or in this final order and judgment shall be deemed an admission or finding of wrongdoing by, or with respect to, any party.

5. In accordance with the agreement of the parties, paragraph 2 of the Agreement of Settlement is interpreted so that neither it nor any other provision of the agreement of settlement grants to General Motors Corporation its successors, reorganized successors, assigns, subsidiaries, affiliates, parents, divisions, predecessors and authorized dealers a defense of assumption of risk in any claims by settlement class members for damages arising out of any vehicle crashes that result in personal injury or death.

6. This settlement agreement and any final order or judgment relating to or arising therefrom shall be without prejudice to Gen-

eral Motors' consideration of any field action, such as a recall campaign, that General Motors in the future may elect to undertake, and nothing therein shall interfere with or limit any right of settlement class members to participate in or benefit from: (i) any opportunity which may be offered voluntarily by General Motors to such settlement class members to participate in any such field action or (ii) any field action that may otherwise be required under the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1381, *et seq.* (the "Act"). This provision shall not be construed to impose any obligation upon General Motors to take any field action or to pay the cost of any field action, including without limitation, any action under the Act or any voluntary action.

7. General Motors shall notify all members of the settlement class by first class United States mail, postage prepaid, (i) that the court has given final approval to the Agreement and (ii). explaining the procedure and providing forms for the settlement class members to obtain certificates.

8. All members of the settlement class who did not duly request exclusion from the settlement class in the time and manner provided in the Notice are hereby barred, permanently enjoined, and restrained from commencing or prosecuting any action, suit, proceeding, claim, or cause of action in any jurisdiction or court against General Motors Corporation or any of the other entities or persons who are to be discharged as noticed above in paragraph 4, based upon, relating to, or arising out of, any of the matters which are discharged and released pursuant to paragraph 4 hereof, excluding any action for damages arising out of any vehicle crashes that result in personal injury or death.

9. The claims of settlement class members who elected to be excluded from the settlement class in the time and manner provided in the Notice are dismissed without prejudice.

10. If the effective date of settlement, as defined in the Agreement, does not occur for any reasons whatsoever, this final order and judgment shall be deemed vacated and shall have no force and effect whatsoever.

11. Without affecting the finality of the final order and judgment in any way, the court reserves continuing and exclusive jurisdiction over the parties, including all members of the settlement class as defined above, and the execution, consummation, administration, and enforcement of the terms of the Agreement.

12. There being no just reason for delay, the clerk is directed to enter this final order and judgment forthwith.

13. **The clerk is further ordered to mark the following cases closed for statistical purposes.**

92cv6450—Cherkas v. GM

92cv7078—St. Clair v. GM

93cv1272—Benson v. GM

93cv1508—Stone Ridge Venture v. GM

93cv1652—Flowers v. GM

93cv1783—Livingston v. GM

93cv1810—Hayes v. GM

93cv1811—Nabors v. GM

93cv1838—McKinnish v. GM

93cv1919—Mayhall v. GM

93cv2063—Martin v. GM

93cv2086—Baldwin v. GM

93cv2244—Haddock v. GM

93cv2360—Anthony v. GM

93cv2768—Key v. GM

93cv3722—Linder v. GM

93cv3821—Verlinghieri v. GM

93cv4237—George v. GM

93cv4366—Nuckolls v. GM

93cv5024—Esparza v. GM

93cv5126—Villareul v. GM

**IT IS SO ORDERED.**

## EXHIBIT A

### *AGREEMENT OF SETTLEMENT*

THIS AGREEMENT is entered into this 19th day of July, 1993, by and between General Motors Corporation (hereinafter "General Motors") and Plaintiffs in MDL Docket No. 961 (hereinafter the "Litigation"), by and through the undersigned General Motors counsel and Plaintiffs' Counsel ("Plaintiffs' Counsel").

WHEREAS, General Motors is a corporation organized under the laws of the State of Delaware and is engaged in the business of, among other things, manufacturing automotive products;

WHEREAS, Plaintiffs are the named plaintiffs in the Consolidated Amended Class Action Complaint (hereinafter the "Complaint"), pending in the United States District Court for the Eastern District of Pennsylvania (hereinafter "Court"), which was filed as a class action on behalf of registered owners of certain 1973 through 1987 model Chevrolet or GMC Truck "C" or "K" series pickup trucks;

WHEREAS, Plaintiffs have alleged in the Complaint that these pickup trucks have an outside the frame rails fuel tank placement design which constitutes a safety defect; seek compensatory and punitive damages for economic losses resulting therefrom under the Lanham Trademark Act, 15 U.S.C. § 1125(a), the Magnuson–Moss Warranty Act, 15 U.S.C. § 23(d)(1), and common law claims including strict liability, fraud, unfair trade practices and breach of contract, and assert that the litigation should proceed as a class action;

WHEREAS, General Motors Corporation denies the material allegations in the Complaint, denies any wrongdoing of any kind, and further believes that the litigation does not satisfy the requirements for a class action and that a class action should not be certified or maintained other than for purposes of settlement as provided in this Agreement, however, General Motors Corporation hereby agrees to the certification of a "Settlement Class";

WHEREAS, the parties have conducted extensive discovery and independent investigations of the facts and analyses of the legal issues, and they recognize the uncertainties of the outcome in the litigation and the likelihood that any final result would require years of further complex litigation and substantial expense;

WHEREAS, Plaintiffs' Counsel on behalf of the Settlement Class believe, ·in light of the costs, risks and delay of continued litigation balanced against the benefits of the settlement to the Settlement Class, that settlement at this time as provided in this Agreement will be in the best interests of the Settlement Class as defined herein;

WHEREAS, General Motors and counsel for Plaintiffs agree that the settlement provided in this Agreement is a fair, reasonable, and adequate resolution of the Litigation;

WHEREAS, the parties desire to compromise and settle in the Litigation all issues and claims which have been brought, or which could have been brought, by or on behalf of persons who are included in the Settlement Class, except claims arising from personal injury or death, and without affecting any proceedings by the National Highway Traffic Safety Administration under the National Traffic and Motor Vehicles Safety Act of 1966;

WHEREAS, the parties desire and intend to seek Court approval of the settlement of the Litigation as set forth in this Agreement and, upon Court approval, the parties intend also to seek a Final Order and Judgment from the Court dismissing the claims of all members of the Settlement Class with prejudice;

NOW, THEREFORE, it is agreed that in consideration of the premises and mutual covenants set forth in this Agreement and the entry by the Court of a Final Order and Judgment dismissing with prejudice the claims asserted in this Litigation by all members of the Settlement Class and approving the terms and conditions of the settlement as set forth in this Agreement, as required by the Federal Rules of Civil Procedure, the Litigation shall be settled and compromised under the terms and conditions contained herein.

1. As used in this Agreement and in the Exhibits annexed hereto, in addition to any definitions elsewhere in this Agreement, the following terms shall have the meanings set forth below:

(a) "GM Pickup Truck[s]" means (i) 1973 through 1986 model year General Motors full-size pickup truck or chassis cab models of the "C" or "K" series which include the following models: Chevrolet C10, C20, C30,

K10, K20, K30 and GMC Truck C1500, C2500, C3500, K1500, K2500, K3500; (ii) 1987 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series, which include the following models: Chevrolet R10, R20, R30, V10, V20, V30 and GMC Truck R1500, R2500, R3500, V1500, V2500, V3500; (iii) 1988 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series, which include the following models: Chevrolet R2500, R3500, V2500, V3500 and GMC Truck R2500, R3500, V2500, V3500; (iv) 1989 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series, which include the following models: Chevrolet R2500, R3500, V2500, V3500 and GMC Truck R2500, R3500, V2500, V3500; and (v) 1990 or 1991 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series, which include the following models: Chevrolet R3500, V3500 and GMC Truck R3500, V3500. GM Pickup Trucks that have been scrapped or are owned by scrap yards or reclamation centers are not included.

(b) The "fuel system design of the GM Pickup Trucks" means the design, manufacture and placement of the fuel tanks outside the frame rails and all related fuel system designs and components, including fuel lines, fuel pumps, fuel filler neck, fill cap, fuel tank shields, attachment devices, and surrounding structure and components.

(c) The "effective date of settlement" shall be the day on which the Final Order and Judgment described in Paragraph 8 below becomes final. For purposes of the Agreement, the Final Order and Judgment shall be deemed to become final on the later of (i) the thirty-first day after it is entered if no motion for new trial or notice of appeal is filed or (ii) if any such documents are filed, on the day following the date on which the Final Order and Judgment is not subject to further judicial review or appeal, either by reason of affirmance by a court of last resort or by reason of lapse of time or otherwise, provided that the Final Order and Judgment are not reversed or substantially modified by the Court or an appellate court.

(d) "Chevrolet" shall mean the Chevrolet Motor Division of General Motors.

(e) "GMC Truck" shall mean the GMC Truck Division of General Motors.

2. This Agreement is for settlement purposes only, and neither the fact of, nor any provision contained in, this Agreement nor any action taken hereunder shall constitute, or be construed as, any admission of the validity of any claim or any fact alleged by Plaintiffs in the Litigation or of any wrongdoing, fault, violation of law, or liability of any kind on the part of General Motors or any admission by General Motors of any claim or allegation made in any action or proceeding against General Motors. This Agreement shall not be offered or be admissible in evidence against General Motors or cited or referred to in any action or proceeding, except in any action or proceeding brought by or against named Plaintiffs, Settlement Class members, or General Motors to enforce its terms, or by General Motors in defense of any claims brought by Settlement Class members.

3. Subject to Court approval, it is agreed by the parties that the Litigation will be deemed, for the purpose of settlement only, to be certified as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, and the persons or entities defined in Paragraph 4 of this Agreement shall be deemed to constitute the Settlement Class on behalf of which the Litigation is settled. Any certification pursuant to this paragraph shall not constitute, in this or any other proceeding, an admission by General Motors or a finding or evidence that any requirement for class certification is otherwise satisfied in the Litigation, except for the limited purposes related to this Settlement Agreement.

4. The Settlement Class shall be defined as follows:

All persons and entities who purchased in the United States (except for residents of the State of Texas) and are owners as of July 19, 1993 of any of the following "GM Pickup Trucks":

(i) one or more 1973 through 1986 model year General Motors full-size pickup

truck or chassis cab models of the "C" or "K" series. These include the following models: Chevrolet C10, C20, C30, K10, K20, K30 and GMC Truck C1500, C2500, C3500, K1500, K2500, K3500;

(ii) one or more 1987 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series. These include the following models: Chevrolet R10, R20, R30, V10, V20, V30 and GMC Truck R1500, R2500, R3500, V1500, V2500, V3500;

(iii) one or more 1988 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series. These include the following models: Chevrolet R20, R30, V20, V30 and GMC Truck R2500, R3500, V2500, V3500;

(iv) one or more 1989 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series. These include the following models: Chevrolet R2500, R3500, V2500, V3500 and GMC Truck R2500, R3500, V2500, V3500; or

(v) one or more 1990 or 1991 model year General Motors full-size pickup truck or chassis cab models of the "R" or "V" series. These include the following models: Chevrolet R3500, V3500 and GMC Truck R3500, V3500.

Excluded from the Settlement Class are residents of the State of Texas, who will be part of a separate, identical class action settlement in Texas state court. Further, no claims for personal injury or wrongful death are being compromised or dismissed as a condition or part of the settlement of this Litigation.

5. Plaintiffs' Counsel and General Motors' counsel shall present this Agreement to the Court as soon as practicable, along with a Motion for Authorization to Disseminate Notice to the Class, in the form attached hereto as Exhibit A, and shall take all appropriate steps to obtain an Order, substantially in the form attached hereto as Exhibit B, (a) finding the settlement sufficiently fair, reasonable, and adequate to allow Notice to be disseminated to members of the Settlement Class; (b) certifying the Settlement Class as provided in this Agreement, (c) approving Notice by mail and publication substantially in the forms attached hereto as Exhibits C and D, and (d) scheduling a hearing on the fairness of the proposed settlement.

6. General Motors shall disseminate Notice as directed in that Order (Exhibit B) as follows:

(a) Summary Notice of the proposed settlement (Exhibit C) shall be published once in all editions of *USA Today* and once in the *Philadelphia Inquirer.*

(b) The mailing of the Notice under this Agreement to the Settlement Class members shall be accomplished by General Motors' delivery of copies of the Notice, addressed to all Settlement Class members whose addresses are found in vehicle registration records maintained by R.L. Polk & Co. as of July 19, 1993, to the United States Post Office for first class mailing with postage prepaid. Such Notices shall bear the return address of the Post Office Box described in Paragraph 18. General Motors shall have no additional obligation to identify or locate Settlement Class members or mail additional copies of the Notice.

(c) General Motors shall have the sole responsibility for giving and paying for the published and mailed Notice provided by Paragraphs 6(a) and (b) and approved in accordance with the order of the Court.

(d) It shall be the responsibility of Plaintiffs' Counsel or their designee to respond to all inquiries from Settlement Class members as appropriate.

7. Subject to Court approval, any Settlement Class member who intends to request exclusion from the Settlement Class or to object to the fairness of the proposed settlement (hereinafter "requests for exclusion" and "objections to the settlement") must mail any such request for exclusion or objection to the settlement in writing to the Clerk of the Court at the address set forth in the mailed Notice postmarked within forty-five (45) days of the initial mailing of the Notice pursuant to Paragraph 6(b). Persons requesting exclusion and objectors to the settlement must set forth their full name and current address

and list the make, model year, and vehicle identification number of their vehicle or vehicles. Objectors to the settlement must state in writing all objections and the reasons therefor, and include any and all supporting papers, including proof of ownership, as of July 19, 1993, of a GM Pickup Truck (such as a true copy of their vehicle title, registration, or license receipt) and, if applicable, the objector's statement of intent to appear at the fairness hearing. Any Settlement Class member who does not file timely written objections to the settlement and notice of his or her intent to appear at the fairness hearing pursuant to this paragraph and the Notice shall not be permitted to object to the settlement at the fairness hearing, and shall be foreclosed from seeking review of the settlement by appeal or otherwise.

8. Following final approval by the Court of this Agreement and the settlement contemplated hereby, the parties shall seek entry of an order in the form annexed hereto as Exhibit E, dismissing with prejudice and without further costs the Complaint, any and all other complaints in the Litigation, and all claims which any Settlement Class members alleged or could have alleged in any way relating to the fuel system design of the GM Pickup Trucks, and dismissing the claims of Settlement Class members who have timely excluded themselves without prejudice; excluding only claims for personal injury or death that have resulted or may result from vehicle crashes.

9. Following entry by the Court of the Final Order and Judgment provided for in Paragraph 8 of this Agreement, no default by any person other than General Motors in the performance of any covenant or any obligation under this Agreement or any order or judgment entered in connection therewith shall affect the dismissal of the Litigation, the discharge of General Motors, or any other provision of Paragraph 8.

10. If (i) the preliminary or final approval of the Agreement and the settlement described herein is not obtained or is reversed on appeal or (ii) the effective date of settlement as defined herein does not occur for any reason or (iii) entry of the Final Order

and Judgment described in Paragraph 8 is finally reversed or (iv) the judgment is substantially modified by the Court, or on appeal, and either Plaintiffs' Counsel or General Motors so elects, this Agreement shall be null and void, shall have no further force and effect with respect to any party in the Litigation, and shall not be offered in evidence or used in the Litigation for any purpose, including the existence, certification, or maintenance of any purported class. In such event, this Agreement and all negotiations, proceedings, documents prepared, and statements made in connection herewith shall be without prejudice to General Motors and plaintiffs, shall not be deemed or construed to be an admission or confession by any party of any fact, matter, or proposition of law, and shall not be used in any manner for any purpose, and all parties to the Litigation shall stand in the same position as if this Agreement had not been negotiated, made, or filed with the Court. In such event, General Motors may elect to move the Court to vacate any and all orders entered by the Court pursuant to the provisions of this Agreement. Plaintiffs expressly reserve the right to seek certification of the class as stated in Plaintiffs' Motion for Class Certification and any amendments thereto.

11. In consideration for dismissal of the Litigation with prejudice under the terms of this Agreement, General Motors agrees as follows:

A. General Motors shall issue to each Settlement Class member, upon written request, a certificate ("Original Certificate") for One Thousand Dollars ($1,000) toward the purchase of any one of the following General Motors light-duty trucks or any replacements for the following models ("new vehicle"):

*Chevrolet* C, K, S10, S Blazer, Astro, Lumina APV, Geo Tracker, Suburban, Crew Cab, G Van (Chevy Van, Sport Van), Full-size Blazer

*GMC Truck* C, K (Sierra), S15, S Jimmy, Safari, Yukon, Suburban, Crew Cab, G Van (Rally, Vandura)

B. The Original Certificate may be applied by the then current owner of the GM Pickup Truck to the purchase of any new

vehicle at any time within fifteen (15) months of the date of written notification by General Motors to the Settlement Class members of the Original Certificate's availability ("redemption period").

C. No trade-in of a GM Pickup Truck is required to purchase a new vehicle with the use of an Original Certificate.

D. The Original Certificates may be used toward the down payment on a new vehicle.

E. The Original Certificates may be transferred with the GM Pickup Trucks to third party purchasers.

F. The Original Certificate may be used within the redemption period by the Settlement Class member who currently owns the GM Pickup Truck, members of his or her immediate family residing at the same address as the Settlement Class member, or by any subsequent title holder of the GM Pickup Truck if the Original Certificate has not been redeemed. The person or entity using the Original Certificate must present to an authorized Chevrolet or GMC Truck dealer proof of current ownership and licensing of the GM Pickup Truck. Acceptable proof shall be the original title and license receipt or registration for the GM Pickup Truck.

G. Any Settlement Class member may elect to designate one (1) family member (limited to parents, brothers, sisters, children, or spouse) who does not reside in the Settlement Class member's household as the recipient of the Original Certificate. This designation must be made within sixty (60) days following the date of mailing of the Notice (Exhibit D) by a sworn written statement from the Settlement Class member stating the name and address of the designated recipient, the designated recipient's relationship to the Settlement Class member, and the vehicle identification number of the GM Pickup Truck. The designee will be sent written notification as provided in Paragraph 11.L. and will be eligible to receive the Original Certificate that the designating Settlement Class member otherwise would be eligible to request.

H. Settlement Class members are not required to disclose their intention to use an Original Certificate toward the purchase of a new vehicle until they have made their best deal with the dealer. The Original Certificate may be used in addition to any marketing incentives, rebates or discounts, reduced interest rates or any other promotional offer available from or through General Motors or General Motors Acceptance Corporation ("GMAC") at the time of the purchase of a new vehicle to which the holder would otherwise be eligible. General Motors will use its best efforts to resolve any disputes or problems which may arise with a dealer regarding the redemption of an Original Certificate.

I. Settlement Class members with Original Certificates may request that non-transferable certificates ("Non–Transferable Certificate") be issued, without the sale of the GM Pickup Truck, to any other person or entity ("designated recipient"), except an authorized General Motors dealer or company affiliated with an authorized General Motors dealer, during the redemption period under the following conditions:

(1) the Original Certificate must be returned by the Settlement Class member to General Motors with a notarized statement requesting the Non–Transferable Certificate and designating the name and address of the person or entity to whom the Non–Transferable Certificate should be issued;

(2) within fourteen (14) days of General Motors' receipt of the documents required by subparagraph (1), General Motors shall mail to the Original Certificate holder, or the designated recipient, a Non–Transferable Certificate for Five Hundred Dollars ($500) toward the purchase of a new GMC Truck "C" or "K" model full-size pickup truck or Chevrolet "C" or "K" model full-size pickup truck or replacement model;

(3) the Non–Transferable Certificate cannot be used after the expiration of the original redemption period; and

(4) the Non–Transferable Certificate may not be used in addition to or in combination with any General Motors' or GMAC marketing incentive, including any rebate or discount or reduced interest rate otherwise available.

J. If a new vehicle is ordered by any Original or Non–Transferable Certificate holder from an authorized Chevrolet or GMC Truck dealer during the redemption period, but General Motors is unable to deliver the vehicle within that period, the Certificate will be honored at the time of delivery of that new vehicle.

K. One (1) Original Certificate will be issued for each GM Pickup Truck owned by the requesting Settlement Class member. Only one (1) Original or Non–Transferable Certificate may be applied toward the purchase of each new vehicle.

L. As soon as reasonably practicable following the effective date of settlement, General Motors shall notify each member of the Settlement Class in writing, at its expense (i) that the Court has given final approval to this Agreement of Settlement and (ii) explaining the procedure and providing forms for Settlement Class members to make written requests for Original Certificates. The form and content of this Notice shall be subject to court review and approval at the request of either General Motors Counsel or Plaintiffs' Counsel.

12. Plaintiffs' Counsel and counsel for General Motors shall use their best efforts to obtain Court authorization to disseminate Notice of this Agreement within ten (10) days after the date of execution of this Agreement. General Motors shall use its best efforts to have the Class Notice pursuant to Paragraph 6 mailed and published within forty (40) days after authorization to disseminate notice is obtained. Plaintiffs' Counsel and counsel for General Motors shall use their best efforts to seek a hearing to obtain final approval of the settlement to be held within sixty-five (65) days following publication of the Notice.

13. If, in the view of General Motors, an excessive number of Settlement Class members have elected to be excluded from the Settlement Class, General Motors may elect to withdraw from the settlement, upon written notice to Plaintiffs' Counsel within fifteen (15) days of the exclusion postmark deadline and subject to Court approval.

14. Plaintiffs' Counsel may apply to the Court for an award of fees and reimbursement of expenses incurred in the Litigation (including experts' fees) they deem reasonable and appropriate. Any such award will be made by the Court. Any such awards shall be payable solely by General Motors, within fourteen (14) days of the later to occur of the effective date of settlement or the entry of the Court's Order awarding fees, costs, and expenses. General Motors reserves the right to object to any application for fees or expenses it deems excessive, and to appeal any amount awarded by the Court over its objection. General Motors shall not be responsible to Plaintiffs' Counsel, any named Plaintiff, or any Settlement Class member for any attorneys' fees or costs, except as specifically provided in this Agreement and awarded by the Court.

15. The parties and their attorneys agree to seek Court approval of this Agreement and to use their best efforts to effect the consummation and implementation of the settlement contemplated hereunder.

16. Upon the effective date of settlement, conditioned upon its continuing performance of all terms and conditions of this Agreement and the Final Order and Judgment, General Motors, its present or former officers, directors, employees, agents, heirs, executors, administrators, successors, reorganized successors, assigns, subsidiaries, affiliates, parents, divisions, predecessors, and authorized dealers shall forever be released and discharged from any and all claims, whether legal or equitable in nature, that were brought in the Litigation by any Settlement Class member or which could have been asserted by any Settlement Class member (except as to such a member who has filed a proper and timely request for exclusion from the Settlement Class) arising out of, or in any way relating to the fuel system design of the GM Pickup Trucks, excluding past, present, and future claims for damages arising out of any vehicle crashes that result in personal injury and death.

17. This Settlement Agreement and any Final Order or Judgment relating to or arising therefrom shall be without prejudice to General Motors' consideration of any field

action, such as a recall campaign, that General Motors in the future may elect to undertake, and nothing therein shall interfere with or limit any right of Settlement Class members to participate in or benefit from: (i) any opportunity which may be offered voluntarily by General Motors to such Settlement Class members to participate in any such field action or (ii) any field action that may otherwise be required under the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1981, *et seq.* (the "Act"). This provision shall not be construed to impose any obligation upon General Motors to take any field action or to pay the cost of any field action, including without limitation, any action under the Act or any voluntary action.

18. Plaintiffs' Counsel shall be responsible for obtaining a United States Post Office Box, for the purpose of receiving requests for exclusion and objections that are submitted in accordance with Exhibits B and D to this Agreement. Plaintiffs' Counsel shall also be responsible for promptly giving notice of the receipt of any such requests for exclusion or objections by providing complete copies to counsel for General Motors at least one time each week.

19. This Agreement and its attachments shall constitute the entire Agreement of the parties and shall not be subject to any change, modification, amendment, or addition without the express written consent of counsel on behalf of all parties to the Agreement.

20. This Agreement shall be binding upon and inure to the benefit of the parties hereof and their representatives, heirs, successors, and assigns.

21. In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision if General Motors and Plaintiffs' Counsel, on behalf of the parties, mutually elect to proceed as if such invalid, illegal, or unenforceable provision had never been included in this Agreement.

22. The Court shall retain continuing and exclusive jurisdiction over the parties hereto, including all members of the Settlement Class, and over the administration and enforcement of the settlement and the benefits to the Settlement Class hereunder. Any disputes or controversies arising with respect to the interpretation, enforcement, or implementation of the settlement must be made by motion to the Court.

23. This Agreement may be executed in counterpart by the parties hereto, and a facsimile signature shall be deemed an original signature for purposes of this Agreement.

24. This Agreement shall be construed under and governed by the laws of the Commonwealth of Pennsylvania.

DATED: July 16, 1993

 GENERAL MOTORS CORPORATION:

 By: (s) Edward C. Wolfe

DATED: July 19, 1993

 PLAINTIFFS:

 By: (s) Dianne M. Nast

 Dianne M. Nast

 KOHN, NAST, & GRAF, P.C.

DATED: July 19, 1993

 GENERAL MOTORS CORPORATION:

 By: (s) Lee A. Schultz

DATED: July 18, 1993

 By: (s) Elizabeth J. Cabraser

 Elizabeth J. Cabraser

 LIEFF, CABRASER & HEIMANN

 Plaintiffs' Co–Lead Counsel

DATED: July 19th, 1993

 By: (s) William S. Lerach

 William S. Lerach

 MILBERG WEISS BERSHAD HYNES & LERACH

DATED: July ____, 1993

 By: (s) Richard S. Schiffrin

 Richard S. Schiffrin

 SCHIFFRIN & CRAIG, LTD.

 Plaintiffs' Steering Committee